[Cite as *State v. Claytor*, 2022-Ohio-1938.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

      Plaintiff-Appellee,           :

                                            No. 110837

      v.                                 :

JAMES CLAYTOR,                          :

      Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 9, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-651866-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Rick L. Ferrara, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, James Claytor ("Claytor"), appeals his convictions for aggravated murder, murder, felonious assault, and aggravated robbery. For the reasons set forth below, we affirm.

## I.    Facts and Procedural History

{¶ 2}    In August 2020, Claytor was charged in a nine-count indictment. Count 1 charged him with aggravated murder, with prior calculation and design. Count 2 charged him with murder. Count 3 charged him felonious assault. Count 4 charged him with aggravated murder while committing or attempting to commit a theft offense. Count 5 charged him with aggravated robbery.[1] Count 6 charged him with theft. Count 7 charged him with telecommunications fraud. Count 8 charged him with tampering with records. Count 9 charged him with misuse of credit cards. The charges resulted from the death of Aaron Swift ("Swift"). The two were involved in bank and unemployment fraud schemes and had a dispute, which ultimately ended in Swift's death.

{¶ 3}    On July 13, 2021, the matter proceeded to a five-day jury trial, at which the state presented testimony from 16 witnesses and offered over 300 exhibits into evidence. A summary of the evidence pertinent to the issues raised in Claytor's appeal follows.

{¶ 4}    Carole Mays ("Mays"), Swift's mother, testified that Swift was 22 years old at the time of his death, but he was mentally disabled and only functioned at about the level of a 12-year-old. For this reason, he did not attend a typical school, was in and out of mental institutions, lived with his mother, and received social security disability payments (with Mays as his power of attorney). She testified that she opened an account for Swift at Huntington Bank and that his social security

---

[1] Each of Counts 1-5 carried both a one- and three-year firearm specification.

checks were deposited directly into that account. Even though Swift was the primary on the account, Mays testified that he did not have access to the money. Mays further testified that Swift did not have many friends because he did not grow up like an "average kid[.] * * * He wasn't home long enough to get friends[s]." (Tr. 263, July 13, 2021.) Mays was protective about his social life because she "didn't trust people because of his mental state."

{¶ 5} Swift met Claytor when Swift and Mays lived in Bedford Heights. Mays knew Claytor because he had been over her house a few times. One day, Mays noticed new checks sent in the mail to Swift from PNC Bank. She thought this was unusual because he had an account at Huntington and testified that Swift would not have known how to open his own bank account. Mays hid the checks from Swift and did not speak with him about the PNC account at that time.

{¶ 6} On July 16, 2020, Mays was working from home and Swift was on his cell phone. Mays noticed Swift pacing around in an agitated state while on a FaceTime call. Mays testified that she walked behind Swift and could see that he was talking to Claytor. She heard Swift tell Claytor, "You took my money. You trying to play me like I'm slow. You did this to me before. You ain't going to keep doing me like this. You took that money and transferred it to your card." (Tr. 270, July 13, 2021.) When Mays heard this, she told Claytor over the video call that she was not going to let Claytor keep doing this to Swift and she was going to call Bedford Heights Police Detective Reed, Swift's mentor, and tell him what Claytor was doing.

Swift continued to talk to Claytor, and Mays went back to work. Swift continued the call outside and remained agitated.

{¶ 7} Thereafter, some food that Mays had ordered arrived, and Swift brought it inside to his mother. He told her that he was going to Claytor's house because Claytor had taken his money. He said Claytor was "trying to play me like I'm slow." (Tr. 271, July 13, 2021.) Swift left his house in Maple Heights at 5:15 p.m. and began to walk to Claytor's house in Bedford. Swift could not drive because he was not medically cleared to do so.

{¶ 8} The next day, Mays realized that Swift had not come home. She called and texted him with no response. Later in the day, police came to the house and told her that Swift had been killed in Bedford. She had learned the day before his death, from her other son, that an unemployment claim with the Ohio Department of Job and Family Services was made in Swift's name. She testified that this is something he did not need and would not know how to do on his own because he did not know "what a claim was." She further testified that she did not help Swift file an unemployment claim, nor did she give anyone else permission to use Swift's social security number to make a claim. Mays said she never gave Claytor permission to use Swift's identification to access money at PNC Bank. Finally, Mays testified that Swift did not own or have access to a gun, and even if he did, he would not have known how to use it.

{¶ 9} Laurel Dolejs ("Dolejs"), a resident in Claytor's townhouse community, testified that she lives in Palmetto Woods in Bedford. She described it

as a townhouse development where you enter driving down a hill, with a circle at the bottom of the hill. Dolejs testified, "Then it kind of goes to the right and you go up a little bit of a hill and then you can either go to the left or to the right to different units." (Tr. 299, July 13, 2021.) Dolejs recalled that on July 16, 2020, shortly before 6:00 p.m., she arrived home from work. She pulled into her driveway and got her bags out of her car. As she unlocked her front door, she heard a series of popping sounds. She described them as "a pop, pop, pop, a small brief space of time and then another pop." (Tr. 301, July 13, 2021.) She opened her door, put her things down, and walked back outside towards her mailbox.

{¶ 10} As she was walked down the sidewalk, a gray car driven by an African-American male passed her heading towards the exit of the development. After retrieving her mail, Dolejs observed two neighbors out on their lawn. One of them said that they called 911. The other said that someone is laying on the ground and not moving. Dolejs walked down the hill towards the person, who was later identified as Swift. The police started to arrive as she approached the scene. Dolejs identified herself as a nurse to the police, checked Swift for a pulse, but did not find one. Dolejs testified that Swift was lying face up.

{¶ 11} Neighbor Donald Richards ("Richards") testified that he has known Claytor's family for 21 years and that the Claytors had lived in their townhouse at 323 Freda Lane for five years. He testified that Claytor drove a silver Chrysler, with damage to the rear passenger door. Richards was retired and worked as a maintenance man for their landlord. He recalled a time in February 2020, when the

landlord asked him to enter the Claytors' home and assess how much paint would be needed to repaint the unit. The next month, a painter who was working in the Claytors' home, alerted Richards to a gun laying on the floor in a front bedroom. Richards entered the unit and observed the gun himself. Richards testified that he had not witnessed the shooting but heard about it and afterwards and informed the police about the gun he previously observed in the Claytors' home.

{¶ 12} Two other neighbors also testified. They were inside their home when they heard what they thought sounded like fireworks. They looked outside and saw a male, later identified as Claytor, standing approximately two to three feet from Swift, who was lying on the ground. They said Claytor was wearing a white t-shirt and got into a gray car.

{¶ 13} Bedford Police Officer Jordan Fischer ("Officer Fischer") testified that he was the first officer to arrive on the scene, shortly after his shift began at 6:00 p.m. He observed Swift lying face up with a pool of blood under his head and torso. Swift was not wearing a shirt or glasses and there were no weapons anywhere near him. While trying to resuscitate Swift, Officer Fischer observed gunshots to the back of Swift's head, face, and torso. Witnesses described the vehicle fleeing the scene as a silver Chrysler with damage to the side. Officer Fischer broadcast this information to other officers, who then tried to obtain video footage. He testified that a red t-shirt, glasses, a cell phone, and four spent shell casings were collected from the scene. The shell casings were determined to be fired from the same gun.

{¶ 14} Cuyahoga County Deputy Medical Examiner Dr. Todd Barr, M.D. ("Medical Examiner") testified that he went to the scene prior to performing the autopsy examination on Swift with Dr. Shawn Silver, M.D., a fellow at the Medical Examiner's Office. The Medical Examiner testified that Swift had been shot five times, and all but one bullet exited Swift's body. His testimony regarding the gunshot wounds was in no particular order.

{¶ 15} One gunshot was to Swift's head. The bullet entered the left side of the back of Swift's head and exited the upper right portion of his forehead. Another gunshot was to Swift's face. The bullet entered just below Swift's left earlobe and exited his right temple. The third bullet entered Swift's left jaw and partially exited his right temple. The fourth bullet was a superficial wound that entered and exited the back, right side of Swift's neck. A fifth bullet entered the mid-portion of Swift's chest and exited the left side of his chest. The Medical Examiner testified that "[i]n the course of that particular gunshot wound, [Swift] sustained injuries to his left lung, his heart and fractures of various ribs." (Tr. 422, July 14, 2021.) Swift also sustained injuries to his brain. The Medical Examiner further testified that Swift had fresh abrasions, which he described as "road rash," to the right eye area, the face, right shoulder, and right knee. The Medical Examiner explained that he could not exactly tell how these injuries occurred, but they could have been sustained when Swift fell to the ground and hit the pavement.

{¶ 16} He further testified that none of Swift's gunshot wounds had accompanying fouling or stippling, indicating that the gun was at least three to five

feet from Swift when it was fired, but it could have been as far as 12 feet away. The Medical Examiner estimated that "three to five feet would be the closest it could have been, but it could have been as — it could have been twelve feet. Anything beyond three to five feet, they are all going to look the same." (Tr. 434, July 14, 2021.)

{¶ 17} Cuyahoga County Forensic Scientist Lisa Przepyszny ("Forensic Scientist") testified that she performed some of the trace evidence testing on Swift. She tested Swift's hair shavings for any powder grains to help determine the proximity of the samples and found, by the absence of any deposited materials, that the gun would have been more than four feet away from Swift when it was fired. The Forensic Scientist stated, "So I would then suggest that the muzzle of the gun was far enough away from the victim that those materials were not deposited. So that would indicate a distant approximate muzzle-to-target distance. * * * So when I say distant, I would say greater than four feet approximately or so." (Tr. 488, July 14, 2021.)

{¶ 18} Ohio State Highway Patrol Analyst Geoffrey Moran ("Analyst") testified that he received cell phone records and cell phone extractions for Swift and Claytor from the Bedford Police Department. He took that data and mapped it. The Analyst had the receipt showing food delivery to Swift's house at 5:15 p.m. He testified that from Swift's home in Maple Heights it would take approximately 38 minutes to walk to Claytor's home in Bedford and approximately 28 minutes to walk to the Glendale School, which is on the way to Claytor's home. Moran had video, collected by the Bedford Police Department, which was played for the jury. The

video depicts Swift walking past the Glendale School at 5:45 p.m., carrying a t-shirt in his hand. At that time, a silver car, later determined to be Claytor's, passes Swift, heading in the direction of Claytor's house, which is the same direction Swift is heading on foot. At 5:57 p.m., that same camera captured the same silver car driving away from Freda Lane and heading in the opposite direction that the car was going in 12 minutes earlier. The Analyst continued to map the progress of the silver car through other videos across the city, which were also played for the jury.

{¶ 19} Bedford Police Detective Benjamin Lang ("Detective Lang") testified that he was the lead investigator on the case. Detective Lang had the description of the suspect's car as a silver Chrysler, and after speaking with some witnesses, he connected the silver Chrysler to Claytor's residence at 323 Freda Lane. Lang observed onlookers near the scene, one of whom was later identified as Tracy Claytor. She was reluctant to give him information and appeared nervous. Because of this, he wanted to investigate further and investigate their residence. Bedford Police obtained a search warrant for 323 Freda Lane and executed it at 1:00 a.m. on July 17, 2020.

{¶ 20} During the search of Claytor's room, the police found nine or ten bank cards in the names of other people. They also found a gun box, a magazine, and ammunition but did not find a gun. In Tracy Claytor's room, the police found an empty gun box for a 9 mm handgun, the same caliber firearm as the one used to shoot Swift. Inside the box, they found three magazines and ammunition similar to the spent casings on scene. No gun was found in the home.

{¶ 21} Detective Lang testified that he put a notice out to neighboring police departments for the silver Chrysler. On July 18, 2020, he was alerted that the car was found on a street near the intersection of Oak Park Boulevard and Fernway in Maple Heights. The police searched the car and recovered a receipt from Parma Armory dated the day of the shooting for the purchase of or payment on a gun. Police also recovered four bank cards, each in a different name. Additionally, Detective Lang followed up on a Raising Cane's receipt that was found in the car and viewed video from the restaurant depicting Claytor driving the car. Lang further testified that on July 20, 2020, Claytor turned himself in to the Bedford Police by coming to the station with the same attorney who represented him at trial. Detective Lang observed no injuries to Claytor's hands or face.

{¶ 22} Detective Lang obtained video evidence from around town, including the video from the Glendale School, which was played for the jury. It depicts Swift walking toward Claytor's house at 5:45:06 p.m. and then shows Claytor passing Swift in his car going in that same direction at 5:45:50 p.m. Swift was not wearing a shirt, but rather carrying it in his hand. Detective Lang testified that it would take someone 5-10 minutes to walk from that location to the location where Swift was shot. Police calls were made at 5:56 p.m. That same camera angle then shows Claytor's car leaving the area at 5:57:22 p.m.

{¶ 23} During the investigation, Detective Lang obtained records from the Ohio Department of Job and Family Services showing that a claim for COVID pandemic unemployment funds was made in Swift's name. The claim form

contained Swift's date of birth, social security number, cell phone number, email address, mother's address, and an image of Swift's state-issued identification card. The start date was June 16, 2020. As of the week of July 5, 2020, there was a balance of $7,371 in the account. However, on July 8, 2020, the contact information was changed to Claytor's cell phone number, home address, and email address.

{¶ 24} Detective Lang further testified to a July 14, 2020 text exchange between Claytor and Swift that was revealed by analysis of their cell phones. Detective Lang stated that when these texts were sent, the COVID unemployment claim had already been made and over $7,300 was sitting in the account. In the first text, time-stamped 11:30:15 p.m., Claytor tells Swift that he does not have any money and just bought another car. Claytor states, "I don't have no cash bra I just bought another car stfu talkin to me bra you lucky I even rolled out my sleep to answer the phone." (Tr. 784, July 16, 2021.) Swift replies at 11:31:20 p.m., saying, "Uber u need a card first of all I know u got sum type of bread on there but it's cool bruh my bread pose hit this week[.]" (Tr. 785, July 16, 2021.)

{¶ 25} At 11:32:16 p.m., Claytor says, "You sound crazy asf bra I spent all my bread on this car to flip you got me f****d up I'll kill you Bout my cut." (Tr. 785, July 16, 2021.) At 11:32:37 p.m., Swift replies, "Ain't no cut b***h stop texting me." (Tr. 785, July 16, 2021.) At 11:33:52 p.m., Claytor texts back, "Aye on my dead n****s if I look on there and it say paid and you Don't gimme no money imma kill yo dawg you fat ugly dumb bitch." (Tr. 786, July 16, 2021.) At 11:34:37 p.m., Claytor adds, "Imma give palo Dese hallows." (Tr. 786, July 16, 2021.) Detective Lang testified

that in his experience as a police officer, "hallows" refer to "Hollow-point bullets," and when searching Claytor's car, the police recovered a hollow-point, 9 mm bullet.

{¶ 26} Two days later, on July 16, 2020, at 5:07 p.m., Swift texted Claytor, "Aye bruh we gotta work" and "Omm." (Tr. 787, July 16, 2021.) Detective Lang testified that in his experience as a police officer, the text's reference to "work" means "a fistfight" and "Omm" means "on my momma." The same day, at 5:32 p.m., Claytor accessed the unemployment account in Swift's name and took a screenshot showing $7,371 in the account and tried to send it to Swift. Swift was shot just prior to 5:56 p.m.

{¶ 27} Detective Lang also testified about Claytor's jail call after he turned himself in to the police on July 20, 2020. The call was played for the jury. In the call, Claytor asks the male (his cousin) on the other end to ask Claytor's grandmother to get him a new SIM card for his phone and for the male to put that SIM card into his phone. Claytor then asks the male to access Claytor's iCloud account where he has five profiles. All the information is on his iCloud account. The male asked where the weekly checks go, and Claytor replied that they all go to him except for one person. The male asked if his iCloud was backed up, and Claytor says he keeps it backed up because this is his profession. Claytor then says it used to be his profession, and he is retiring. Claytor says that he wants to come home to some money and work for this male. During the call, Claytor complains that when the police searched his house, they took the cards that have money on them. The male replies that he should report the cards as lost or stolen. Claytor asks the male to

write down Swift's social security number and password and asks him to see if that one will hit. The male checks that information and informs Claytor that it did not work. Claytor replies that it probably did not get approved and then tells the male to change the password but to keep it because it is the password to his iCloud account as well.

{¶ 28} Detective Lang further testified about an incident when Claytor was in the Bedford Jail and tried to pass a note to another inmate, telling that inmate to open a PNC virtual wallet account, deposit $1,500 into growth saving, and turn on the overdraft protection. The note then said to withdraw the $1,500 at 11:50 p.m., withdraw another $1,500 at 12:00 a.m., go to Omega Baptist Church and tell them Claytor sent you, get baptized, and then get his passport and meet Claytor in Texas.

{¶ 29} Claytor testified on his own behalf. He testified that he had three guns he purchased from Parma Armory and usually carried his guns in a nylon, clip-on holster. Claytor started purchasing guns for protection after he was shot and robbed in 2018. Claytor testified he began running bank scams after he lost his own credit card, disputed the transactions, and the bank reimbursed the money. When asked by defense counsel if he knew what he was doing was dishonest and wrong, Claytor replied,

> I knew it could be illegal, but I felt like as long as I paid the people that I was doing it with, it wasn't really dishonest, because the institutions already have insurance for a lot of the money that goes under the fraud category. So I felt as long as I just stole from the institutions and not the individuals, themselves, and cut them in that I was doing a good deed.

* * *

Not necessarily a good deed, but I wasn't hurting anybody.

(Tr. 893, July 19, 2021).

{¶ 30} The PNC scam was an instant cash flip Claytor performed by using a willing participant's bankcard and log-in information to basically deposit money and then withdraw it before the overdraft protection kicked in and then withdraw the overdraft money as well.

{¶ 31} Claytor began scamming Ohio's COVID unemployment fund at the end of February 2020, by setting up other people's claims for them. He would charge $3,000 to create the claim and then falsify the work history to pump up the amount of backpay received. Claytor testified that these scams took longer to develop because the person had to be eligible and then be approved to receive the money, a process by the time July came, took weeks to accomplish.

{¶ 32} Claytor testified that he first met Swift in 2014, and considered him a friend. They hung out, smoked marijuana, and played video games together. Claytor testified that they "never really had any problems with each other." Claytor started scamming with Swift after Swift lost his job at Amazon. They started with the PNC scam and then did the COVID unemployment fund scam. They set up the unemployment scam in June 2020. Swift gave Claytor his social security number and state identification. Claytor falsified Swift's earnings to increase the amount he would receive, but the scam took weeks to process payment. Claytor testified that Swift got impatient about the payout and accused Claytor of stealing his share.

{¶ 33} Claytor testified that two days prior to the shooting, on July 14, 2020, Swift texted him around 11:30 p.m. asking for Claytor to pay for his Uber. Claytor declined, telling Swift that he was asleep, and the two traded threats. Swift "was like, yeah, once I get the cut — I mean, once I get the money, you're not getting a cut. I was like stop playing, I'm gonna kill you about my cut[.]" (Tr. 909, July 19, 2021.) Claytor testified that the two of them were joking and often talked to each other like that. Claytor testified that he told Swift he was sleeping even though he really was awake because did not want to give Swift a ride. Claytor testified that the two of them hung out the next day and smoked marijuana together. Claytor gave Swift two to three ounces of marijuana to hold him over until the claim went through.

{¶ 34} On the day of the shooting, following the text exchange in which Swift references fighting and "on my momma," Swift called Claytor between 5:00 and 5:15 p.m. over FaceTime. Swift was "livid" because someone told him that Claytor already received their money. Claytor testified that he tried to tell Swift that he did not have his money and to check the claim for himself. Swift did not believe Claytor and told him "don't make me come kill you." (Tr. 911-12, July 19, 2021.) Claytor replied, "I don't have your money. You tripping" and then the call ended. (Tr. 912, July 19, 2021.) Claytor testified that Mays got on the call and said, "oh, that's federal. You can go to jail for that. I can get you shot for that." (Tr. 912, July 19, 2021.) Claytor replied that he did not have the money.

{¶ 35} After the call ended, Claytor testified that he pulled up the claim and saw that it was still pending. He testified that he took a screenshot of it and sent the

screenshot to Swift. This was at 5:32 p.m. Claytor testified that iMessage indicated it was still sending. He thought by sending the screenshot, Swift would see that the money was still in the account and calm down. Then, Claytor's mother texted him and told him that she was locked out of the house and needed to get inside. Claytor was driving at the time, so he headed home to let her in so she could use the bathroom. He testified that while he was driving home, he did not notice Swift walking on the sidewalk in the direction of Claytor's home at 5:45 p.m.

{¶ 36} When he got home, Claytor checked his phone, which showed that the screenshot was still sending, so Claytor had a feeling that Swift probably did not receive the text because Swift's phone was powered off. After unlocking the house for his mother, Claytor left to head back to his girlfriend's house. As he was driving out of the development, Claytor testified that he observed Swift by the circle walking with his shirt in his hand. Claytor pulled to the side of the circle, stopped his car, and got out with his phone in his hand. He had Swift's unemployment claim on his phone and tossed it in Swift's direction, telling him to look and see that the account still had the money in it. Swift then threw his shirt and glasses in the grass and said "he wasn't trying to hear none of that[.]" (Tr. 917, July 19, 2021.) Claytor testified that Swift then stepped toward Claytor, and he took a step back.

{¶ 37} Claytor testified that he had a gun in his hip holster, and as he stepped back, Swift took a bigger step towards him and "push tripped him," causing him to fall backwards. Claytor testified that he saw a "square" in Swift's pocket that looked like a gun. When he fell back, his holster fell off the waistband of his jogging pants

to the ground. They both tried to grab the gun, but since Claytor was already there, he grabbed the gun first. He shot at Swift through the holster. He testified that he continued to shoot as he stood up, stating that Swift was still coming toward him. Swift then fell to the ground. Afterwards, Claytor was nervous and scared, so he got into his car and left the scene. He headed to his girlfriend's house. On the way, he parked his car on a side street and threw his gun away into a dumpster. He did not have his cellphone because he left it at the scene.

{¶ 38} After the conclusion of the trial, the jury found Claytor guilty of two Counts of aggravated murder (Counts 1 and 4), murder (Count 2), felonious assault (Count 3), aggravated robbery (Count 5), telecommunications fraud (Count 7), tampering with records (Count 8), and misuse of credit cards (Count 9). The jury also found Claytor guilty of each of the accompanying one- and three-year firearm specifications on Counts 1-5. The jury found Claytor not guilty of theft as charged in Count 6. The trial court referred Claytor for a presentence-investigation report prior to sentencing.

{¶ 39} In August 2021, the court held Claytor's sentencing hearing. The court merged Counts 1-4 for the purposes of sentencing, with the state electing to sentence Claytor on Count 1 (aggravated murder). After considering all required factors of the law, the court sentenced Claytor to

> life in prison with the possibility of parole after 25 years on count 1, aggravated murder 2903.01 A * * * with firearm specification(s) — 1 year (2941.141), firearm specification(s) — 3 years (2941.145). 3 year firearm specification to run prior to and consecutive to base charge.

Defendant sentenced to 8 years prison on count 5, aggravated robbery 2911.01 A(3) F1 with firearm specification(s) — 1 year (2941.141), firearm specification(s) — 3 years (2941.145). 3 year firearm specification to run prior to and consecutive to base charge in count 1 and prior to and consecutive to 3 year firearm specification in count 1.

Defendant sentenced to 12 months prison on count 7, telecommunications fraud 2913.05 a F5.

Defendant sentenced to time served on count 8, tampering with records 2913.42 a(1) M1.

Defendant sentenced to time served on count 9, misuse of credit cards 2913.21 C M1.counts to run concurrent to each other for a life sentence with the possibility of parole after 31 years.

This case to run consecutive to CR-658069.

(R. 65, Aug. 31, 2021.) The court also gave Claytor 405 days of jail-time credit and waived costs, fines, and fees.

{¶ 40} Claytor now appeals, raising the following five assignments of error for review.

**Assignment of Error One:** The state presented insufficient evidence of [Claytor's] guilt of aggravated murder and felony murder, and insufficient evidence to overcome [Claytor's] established claim of self-defense.

**Assignment of Error Two:** The trial court erred in denying [Claytor's] motion to suppress evidence by denying a *Franks* hearing on whether the affidavit established probable cause.

**Assignment of Error Three:** [Claytor] was deprived of due process of law by failure of the court, defense counsel, and/or the state of Ohio to include jury instructions incorporating SB175.

**Assignment of Error Four:** The state of Ohio committed prosecutorial misconduct by using facts not in evidence and making argument[s] inconsistent with controlling law to undermine [Claytor's] self-defense claim.

**Assignment of Error Five:** The manifest weight of evidence did not support a conviction of [Claytor] o[n] counts 1 through 5.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 41} In the first assignment of error, Claytor argues the state failed to: (1) present sufficient evidence of prior calculation and design to support his conviction for aggravated murder under R.C. 2903.01(A), (2) present sufficient evidence of a nexus between a theft offense and aggravated murder under R.C. 2903.01(B) and aggravated robbery under R.C. 2911.01(A)(3), and (3) overcome Claytor's claim of self-defense.

{¶ 42} An appellate court, when reviewing sufficiency of the evidence, must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 43} In *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, the Ohio Supreme Court recently cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

### 1. Aggravated Murder — Prior Calculation and Design

{¶ 44} In the instant case, Claytor was charged with aggravated murder under R.C. 2903.01(A), which requires the state to prove Claytor caused Swift's death "purposely, and with prior calculation and design." In construing this element, the Ohio Supreme Court has held that the statute's own terms "suggest[ ] advance reasoning to formulate the purpose to kill." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. It is not enough for the state to demonstrate that Claytor purposely killed Swift. Rather, the state needs to provide "evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *Id.*

{¶ 45} As the *Jones* Court noted, "[t]here is no bright-line test for determining whether a defendant's actions show a premeditated decision or studied

consideration to kill — each case turns on its own facts." *Id.* at ¶ 17, citing *Walker* at ¶ 19. The three factors set forth in *State v. Taylor*, 78 Ohio St.3d 15, 676 N.E.2d 82 (1997), help guide this court's inquiry in determining whether a defendant acted with prior calculation and design. The *Taylor* framework asks: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events'?" *Id.* at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

{¶ 46} The *Taylor* factors, however, are not dispositive. *Jones* at ¶ 17. "Rather, a trier of fact's finding of prior calculation and design is warranted when the evidence shows a defendant had the time and opportunity to plan a homicide and the homicide's circumstances '"show a scheme designed to implement the calculated decision to kill."'" *Id.*, quoting *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 148, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph three of the syllabus.

{¶ 47} When these principles are read together, they refine the question facing us in this appeal: could a reasonable juror — believing the state's evidence and drawing all reasonable inferences in the state's favor — find beyond a reasonable doubt that Claytor acted with advance reasoning to formulate a purpose to kill Swift? Reviewing the evidence presented at trial in a light most favorable to the state, we

conclude that a reasonable juror could make such a finding here. And applying the *Taylor* framework to the instant case helps make that clear.

{¶ 48} With regard to the first *Taylor* guidepost — whether the accused knew the victim and whether their relationship was strained — Claytor acknowledges that a dispute existed, but it was one-sided. Claytor contends that he tried to "cool-down" the situation between him and Swift. Under *Taylor*, however, we look to whether the relationship was strained, not whether the dispute was mutual, as Claytor contends.

{¶ 49} The evidence presented at trial demonstrates that Swift and Claytor have known each other since 2014. The two of them engaged in a bank scam with PNC Bank and then filed a fraudulent unemployment claim with the state. Two days prior to the shooting, Claytor and Swift argued and Claytor threatened to kill Swift over his cut of the fraudulent unemployment claim. Then, approximately 40 minutes prior to the shooting, Swift texted Claytor references about wanting to "fight" and "on my momma." The texts were followed by a heated argument over FaceTime regarding the money. Swift was pacing and agitated. He told Claytor, "You took my money. You trying to play me like I'm slow." Both Claytor and Mays's testimony corroborated the heated nature of the call. After the call ended, Swift told his mother that he was walking to Claytor's house because Claytor was trying to "play him." Based on the foregoing, it is clear that Claytor and Swift knew each other and that their relationship was strained.

{¶ 50} The second inquiry in *Taylor* is whether "the accused [gave] thought or preparation to choosing the murder weapon or murder site?" *Id.*, 8 Ohio St.3d 19, 676 N.E.2d 82. Claytor, relying on *State v. Hicks*, 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, *discretionary appeal not allowed,* 145 Ohio St. 3d 1458, 2016-Ohio-2807, 49 N.E.3d 320, argues that he did not choose the murder site. We disagree. We find *Hicks* is distinguishable. We further find that a reasonable juror could conclude that Claytor considered the murder's location.

{¶ 51} In *Hicks*, this court found that the trial court should have granted defendant's motion for acquittal on the aggravated murder count because the evidence did not support a finding of prior calculation and design beyond a reasonable doubt. *Id.* at ¶ 58. We held that too much was unknown about the moments leading up to and the circumstances surrounding the victim's death for the jury to do anything more than speculate as to whether defendant planned a scheme to implement a calculated decision to kill the victim, his wife, or whether her murder was the result of an almost spontaneous eruption of events without studied consideration. *Id.*

{¶ 52} In *Hicks*, however, the record reflects that the defendant's threats consisted of him threatening to leave the victim if she continued bringing up the issue of his infidelity. There was no evidence that he had threatened her life or otherwise threatened her with physical harm. *Id.* at ¶ 48. Whereas, in the instant case, there is evidence of death threats between Claytor and Swift in their texts and

while they were on the phone two days prior, as well as within one hour of the shooting.

{¶ 53} A review of the record reveals that after the heated FaceTime call between Swift and Claytor, Swift headed to Claytor's house on foot. Surveillance video from the Glendale School depicts Swift walking toward Claytor's house at 5:45:06 p.m. and then shows Claytor driving past Swift, heading in the same direction, at 5:45:50 p.m. It was a 5-10 minute walk from the school to the location where Swift was shot. Neighbors reported shots fired at 5:56 p.m. The same camera angle then shows Claytor's car leaving the area at 5:57:22 p.m.

{¶ 54} Claytor testified that he knew Swift was upset and Swift told him that he was coming to his house. He said he tried to calm Swift down by sending him a screenshot of the claim showing that the funds were still in the account, but the text was never delivered. When Claytor drove past Swift on his way home, Claytor had time to go home and get a gun, if he did not already have a gun with him. Claytor then met Swift at the circle in his townhouse development, which is the only way out, with no witnesses or surveillance cameras. He parked his car on the side of the road and approached Swift. He then shot Swift five times from a range of at least three to five feet but which could have been as many as twelve feet. Two gunshots were to the back of Swift's head. In addition, there was no sign of a struggle and none of the witnesses testified that they heard an argument or a fight before the gunshots were fired. Furthermore, Claytor's DNA was nowhere on Swift's hands and Claytor had no visible injuries when he turned himself in to the police. After the

shooting, Claytor fled to his girlfriend's house, disposed of the gun in a dumpster, and left his car parked on a different street before arriving to her house.

{¶ 55} A jury could reasonably infer from this evidence that Claytor knew or expected Swift to come to his house and gave thought to the murder site.

{¶ 56} A reasonable juror could also find that Claytor gave thought to the choice of the murder weapon. Claytor testified that he always carries a gun after he was robbed in 2018. While Claytor is correct in that the mere possession of a firearm is not enough to establish prior calculation and design, the facts here show more than Claytor simply having a gun that he regularly carried on his person when he encountered Swift. Rather, the evidence demonstrates Claytor's affirmative choice to bring a loaded gun to his confrontation with Swift when he knew Swift was livid and wanted to fistfight. A jury could infer from these facts that Claytor intended to use the gun, and such an inference would support the jury's finding that he formed a plan to kill Swift. *Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, at ¶ 24, citing *State v. Palmer*, 80 Ohio St.3d 543, 569, 687 N.E.2d 685 (1997).

{¶ 57} The third and final *Taylor* guidepost asks, "was the act drawn out or 'an almost instantaneous eruption of events'?" *Id.*, 78 Ohio St.3d at 19, 676 N.E.2d 82, quoting *Jenkins*, 48 Ohio App.2d at 102, 355 N.E.2d 825. Claytor argues that the encounter was not drawn out and all the witnesses heard a rapid succession of shots. That Claytor's decisions and actions occurred over a short time does not preclude a finding of prior calculation and design. The Ohio Supreme Court has consistently found that "a defendant can conceive and execute a plan to kill, even if

formulated within a few minutes, when there is evidence that the defendant's actions 'went beyond a momentary impulse and show that he was determined to complete a course of action.'" *Jones* at ¶ 26, quoting *State v. Conway*, 108 Ohio St. 3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 46.

{¶ 58} In the instant case, the events took place in short order. However, no matter how quickly the shooting happened, a juror could reasonably infer from Claytor's actions before and during the shooting — including his communications with Swift, Mays's threat that she was going to tell Detective Reed about Claytor's scams, Claytor driving past Swift on his way home, his decision to pull over and confront Swift in his development, his decision to carry a loaded firearm to this confrontation, and his choice to shoot Swift — that Claytor had adopted and carried out a plan to kill. *Id.*, citing *Conway.*

{¶ 59} This does not mean that the evidence precludes any other inferences, such as Claytor's self-defense argument. "But on a sufficiency review, the evidence need not satisfy so high a burden." *Id.* at ¶ 27. "Where reasonable minds can reach different conclusions upon conflicting evidence, determination as to what occurred is a question for the trier of fact. It is not the function of an appellate court to substitute its judgment for that of the factfinder." *Jenks*, 61 Ohio St.3d at 279, 574 N.E.2d 492. As a result, we find sufficient evidence to sustain Claytor's aggravated murder conviction under R.C. 2903.01(A).

**2. Aggravated Robbery and Aggravated Murder (R.C. 2903.01(B))**

{¶ 60} Claytor also argues that the state failed to present sufficient evidence of aggravated robbery in Count 5 and therefore failed to present sufficient evidence of aggravated murder in Count 4.

{¶ 61} Claytor was convicted of aggravated murder in violation of R.C. 2903.01(B), which provides in relevant part that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit * * * aggravated robbery[.]" The aggravated robbery with which Claytor was charged under R.C. 2911.01(A)(3) states that "in attempting or committing a theft offense, as defined in section 2913.01 and 2913.02 of the Revised Code * * * upon Aaron Jerome Swift and/or the State of Ohio [Claytor] did inflict, or attempt to inflict, serious physical harm on Aaron Jerome Swift." Relevant to the instant case, a theft offense includes telecommunications fraud under R.C. 2913.05(A), which provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception." R.C. 2913.02(A)(3).

{¶ 62} Claytor contends that the accused's intent to deprive the owner of the property must coincide with the force or threat of force used in connection with the theft offense or flight thereafter. Claytor argues that there was insufficient evidence to demonstrate that he was simultaneously attempting to commit a theft offense when he shot Swift because he had not committed a concurrent deception. The theft alleged in this case was the fraudulent unemployment claim against the state of Ohio. This deceptive act began a month prior to the shooting when the claim was

first filed in June 2020. Neither Claytor nor Swift attempted to submit new, falsified documents on the day of Swift's death.

{¶ 63} The state acknowledges that "the typical robbery occurs when an assailant takes something from the victim's person, during which the assailant also causes harm to that same person," but contends that the law does not require the theft be quick in order to still be in the "attempt" stage when the serious physical harm befalls someone. The state maintains that Claytor's attempted theft of money from the state was still ongoing when Claytor shot Swift, which is sufficient proof of theft at the time of serious physical harm to prove aggravated robbery. We find the state's argument more persuasive.

{¶ 64} A plain reading of R.C. 2911.01(A)(3) reveals that no such simultaneity is required, as Claytor contends. The statute expressly prohibits the infliction or an attempt to inflict serious physical harm on another while attempting or committing a theft offense. By its verdict, the jury effectively rendered a finding that Claytor, in *attempting* the theft offense against the state, inflicted serious physical harm to Swift. The evidence at trial revealed that Claytor and Swift's attempted theft of unemployment funds from the state was still pending when Claytor shot Swift. The evidence further revealed that Swift believed Claytor was attempting the steal his share of the fraudulent unemployment claim, and Claytor changed the contact information on the claim from Swift's information to his own. These facts fall squarely within the reach of the statute.

{¶ 65} Therefore, when considering the foregoing in a light most favorable to the state, we conclude that there was sufficient such that the jury rationally could have found the essential elements of aggravated robbery. Because the aggravated murder charge in Count 4 is predicated on the aggravated robbery charge in Count 5, we also conclude that there was sufficient evidence to establish that Claytor committed aggravated murder in violation of R.C. 2903.01(B).

### 3. Self-defense

{¶ 66} Lastly, Claytor argues that the state failed to present sufficient evidence to prove beyond a reasonable doubt that he did not use reasonable force. More specifically, Claytor contends that the state failed to prove beyond a reasonable doubt that a person who shoots another from a range of three feet could not have acted in self-defense, as Claytor testified at trial.

{¶ 67} This argument is misplaced. The sufficiency of the evidence standard only applies to elements the state must prove during its case in chief, not the affirmative defense of self-defense. *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 46, citing *State v. Messenger*, 2021-Ohio-2044, 174 N.E.3d 425, ¶ 43-44 (10th Dist.). As a result, we decline to address the argument as presented under a sufficiency standard. However, his self-defense argument is addressed below in the third and fifth assignments of error.

{¶ 68} Therefore, the first assignment is overruled.

### B. Motion to Suppress

{¶ 69} In the second assignment of error, Claytor argues the trial court erred when it denied his motion to suppress because the police failed to demonstrate probable cause to search his home.

{¶ 70} Here, Claytor filed a motion to suppress, arguing that the search of his home was unlawful. He contends that the police's request for the search warrant was based on a general description of a car that was loosely associated with his residence and a maintenance man's uncorroborated report of seeing a handgun in the residence sometime in the past. The state opposed the motion, and the trial court held a hearing. Following the conclusion of the hearing, the trial court denied Claytor's motion to suppress, finding that the search warrant was valid.

{¶ 71} Claytor contends that the court should have held a *Franks* hearing because the search warrant omitted that the gun the maintenance man noticed in Claytor's residence was observed four months prior to the shooting.

{¶ 72} Under *Franks v. Delaware*, 438 U.S. 154, 155, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a search violates the Fourth Amendment's prohibition on unreasonable searches if it is conducted pursuant to a warrant that is based upon an affidavit containing one or more material misrepresentations, these misrepresentations were made knowingly or in reckless disregard for the truth, and misrepresentations are necessary to the probable cause finding in the affidavit.

{¶ 73} A review of the suppression hearing reveals that defense counsel, during his discussion with the trial court, stated, "That's not really a [*Frank's*] issue." (Tr. 26, May 26, 2021). The court thought maybe it was, and defense counsel replied

"[m]aybe it teeters on the edge." *Id.* The state replied that it "appreciate[d] defense counsel saying this is not a [*Frank's*] motion." (Tr. 29, May 26, 2021).

{¶ 74} Based on the foregoing, defense counsel elected not to request a *Franks* hearing, but rather chose to have the trial court proceed to review the motion to suppress on its merits. The decision not to pursue a *Franks* hearing was made by defense counsel and is therefore waived on appeal. *State v. Rigel*, 2d Dist. Clark No. 2016-CA-50, 2017-Ohio-6906, ¶ 14.

{¶ 75} At the hearing, Claytor's argument focused on the lack of probable cause on the face of the affidavit because it stated that the maintenance person had previously seen a firearm inside of the home. The affidavit did not include a statement saying that the maintenance person saw the gun in the home four months earlier. Even if this entire paragraph were deleted, the affidavit included sufficient information to support a probable cause finding because it contained information that witnesses observed a gray Chrysler leaving the scene right after the shooting and the Chrysler is connected to Claytor's house, a fact that Claytor's mom admitted to the police. Therefore, the search warrant was facially valid, and the trial court properly denied his motion to suppress.

{¶ 76} Accordingly, the second assignment of error is overruled.

### C. Self-defense Jury Instruction

{¶ 77} In the third assignment of error, Claytor argues he should have been given a jury instruction on "stand your ground." He contends he was deprived of due process when the court failed to instruct the jury that a person no longer has a

duty to retreat under retroactive application of the self-defense statute and the jury shall not consider this duty when considering a claim of self-defense. R.C. 2901.09(B) and (C).

{¶ 78} Ohio's "Castle Doctrine" creates an exception to the duty to retreat and provides that a defendant who is lawfully in his residence has no duty to retreat before using force in self-defense. R.C. 2901.09(B). R.C. 2901.05(B)(1) extended this doctrine by creating an additional presumption that a defendant who uses deadly force against a person unlawfully in the defendant's home is presumed to have acted in accordance with the castle doctrine. *State v. Walker*, 8th Dist. Cuyahoga No. 97648, 2012-Ohio-4274, ¶ 60. Under the recently amended version of R.C. 2901.09, effective April 6, 2021, the trier of fact shall not consider the duty to retreat as a factor when determining whether the person reasonably believed that force was necessary to prevent injury, loss, or risk to life or safety. R.C. 2901.09(C).

{¶ 79} However, that law has been deemed not to be retroactive in its application. *State v. Fisher*, 8th Dist. Cuyahoga No. 108494, 2020-Ohio-670, ¶ 24, fn. 2, citing *State v. Koch*, 2d Dist. Montgomery No. 28000, 2019-Ohio-4099. Therefore, the amendments do not apply.

{¶ 80} Here, over the objection by the state, the court instructed the jury on self-defense as follows:

> Self-Defense. The defendant is allowed to use deadly force in self-defense. Evidence was presented that tends to support a finding that the defendant used deadly force in self-defense. The State must prove beyond a reasonable doubt that the defendant did not use deadly force in self-defense.

Self-defense means that the defendant was not at fault in creating the situation giving rise to aggravated murder, murder, felonious assault and/or aggravated robbery.

The defendant had reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent and/or immediate danger of death or great bodily harm.

\* \* \*

Duty to Retreat. The defendant had a duty to retreat if he was at fault in creating the situation giving rise to aggravated murder, murder, felonious assault and/or aggravated robbery or did not have a reasonable grounds to believe and an honest belief that he was in imminent and/or immediate danger of death or great bodily harm and/or had a reasonable means of escape from the danger, other than the use of deadly force.

No Duty to Retreat. Generally the defendant did not have a duty to retreat if he retreated and/or escaped from the situation and/or reasonably indicated his intention to retreat and/or escaped from the situation and no longer participated in it, and he then had reasonable grounds to believe and an honest belief that he was in imminent and/or immediate danger of death or great bodily harm, and the only reasonable means of escape from the danger was by the use of deadly force, even though he was mistaken as to the existence of that danger.

(Tr. 1034-36, July 19, 2021.)

{¶ 81} We note that in order to establish the inapplicability of self-defense, the state had to demonstrate either "(1) that [Claytor] was at fault in creating the situation giving rise to the affray; (2) that [Claytor] lacked a bona fide belief that he was in imminent danger of death or great bodily harm or that another means of escape from such danger existed negating the need for the use of deadly force; or (3) that [Claytor] violated a duty to retreat or avoid the danger." *State v. Walker*, 8th Dist. Cuyahoga No. 109328, 2021-Ohio-2037, ¶ 14, citing *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 46 (8th Dist.). The state only needs to prove one of

these elements beyond a reasonable doubt in order to establish that self-defense does not apply. *State v. Travis*, 8th Dist. Cuyahoga No. 110514, 2022-Ohio-1233, ¶ 27.

{¶ 82} In the instant case, the state demonstrates that Claytor created the situation. He enlisted Swift and orchestrated the scam of the state's COVID unemployment fund. On the day of the shooting, he testified that knew Swift was upset and Swift told him he was coming to his house to confront him about his cut of the scheme. Mays also stated to Claytor on the FaceTime call that she was going to tell Detective Reed about his scams. Claytor then drove past Swift on his way home and drove past Swift again on his way out of his townhouse development. Instead of avoiding a confrontation with Swift, Claytor chose to stop and confront him, even though he knew Swift was "livid." Claytor then approached an unarmed Swift and shot him five times, once in the back of the head, once in the back of his neck, once in the face, once in the jaw, and once in the chest.

{¶ 83} Therefore, based on the foregoing, the self-defense argument is inapplicable to the case regardless of whether the jury was instructed that it was no longer allowed to consider the possibility of retreat as a factor.

{¶ 84} Accordingly, the third assignment of error is overruled.

### D. Prosecutorial Misconduct

{¶ 85} In the fourth assignment of error, Claytor argues the state committed plain error by misstating certain facts to the jury regarding his distance from Swift when he shot him and the applicability of his self-defense claim.

{¶ 86} "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 364, citing *State v. Smith*, 14 Ohio St.3d 13, 470 N.E.2d 883 (1984). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "'Given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, *there can be no such thing as an error-free, perfect trial*, and * * * the Constitution does not guarantee such a trial.'" (Emphasis sic.) *State v. Majid*, 8th Dist. Cuyahoga No. 96855, 2012-Ohio-1192, ¶ 40, quoting *United States v. Hasting*, 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

{¶ 87} Claytor essentially argues that the prosecutor misled the jury by misstating facts and claiming that Swift was four feet away from Claytor when he shot him. However, the Medical Examiner testified that the shooter would have been no closer than three feet, but perhaps as far away as twelve feet, and the Forensic Scientist testified that four feet would be the closest range. These ranges all include the four-foot range that the state argued. We cannot say that this conduct deprived Claytor of a fair trial.

{¶ 88} Claytor additionally argues that the state should not have been allowed to contend that Claytor is not entitled to self-defense because he is a criminal who created the affray by enlisting Swift to aid him in the COVID

unemployment fund scheme. This conduct also did not deprive Claytor of a fair trial when the evidence demonstrated that Swift was angry about their theft proceeds because he thought Claytor was stealing his share, Claytor knew Swift was upset with him and was coming to confront him, and Claytor confronted Swift on the side of the road instead of driving away.

{¶ 89} Therefore, the fourth assignment of error is overruled.

**E. Manifest Weight of the Evidence**

{¶ 90} In the fifth assignment of error, Claytor argues the jury lost its it way when it found that he planned to kill Swift and that he was not using self-defense.

{¶ 91} When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541 (1997), quoting *Martin* at 175.

{¶ 92} As this court has previously stated:

> The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio

St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id*., quoting *Thompkins* at *id*.

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 93} Claytor argues the jury created a manifest injustice when the evidence could not have established that he did not defend himself beyond a reasonable doubt. We disagree. As discussed above, the self-defense argument is inapplicable because Claytor created the situation giving rise to the affray. He and Swift planned to scam the state's unemployment fund. He could have chosen to drive past Swift on his way out of his development and avoid confronting Swift, but he did not. Instead, Claytor chose to stop, confront Swift, and shoot him five times.

{¶ 94} A "'conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version.'" *Walker*, 8th Dist. Cuyahoga No. 109328, 2021-Ohio-2037 at ¶ 18, quoting *State v. Lipkins*, 2017-Ohio-4085, 92 N.E.3d 82, ¶ 39 (10th Dist.), citing *State v. Gale*, 10th Dist. Franklin No. 05AP-708, 2006-Ohio-1523, ¶ 19. Here, there is ample evidence that Claytor and Swift were involved in an elaborate scheme to defraud the state of $7,300 in a bogus unemployment claim. This was the second time in 2020

that Claytor and Swift engaged in a scam to defraud money from a third-party. Swift got anxious and demanded his money. The two of them argued about Swift's cut before either of them ever received a cent. Claytor and Swift exchanged threats over the money. Mays also threatened Claytor, stating that she was going to tell Detective Reed about him. Claytor stopped his car and encountered Swift, who was on his way to Claytor's house. Claytor shot Swift five times, never letting Swift touch him. Then, even while in jail for Swift's murder, Claytor still tried to get the money.

{¶ 95} Based on these reasons, the weight of the evidence did not support a self-defense theory, and Claytor's convictions on Counts 1-5 (aggravated murder, with prior calculation and design, murder, felonious assault, aggravated murder while attempting to commit a theft offense, and aggravated robbery) are not against the manifest weight of the evidence.

{¶ 96} The fifth assignment of error is overruled.

### III. Conclusion

{¶ 97} For the reasons stated above, we find sufficient evidence to sustain Claytor's convictions, and his convictions are not against the manifest weight of the evidence. We further find that Claytor's motion to suppress was properly denied, the self-defense instruction is inapplicable to the case, and the state did not commit prosecutorial misconduct.

{¶ 98} Accordingly, the judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

SEAN C. GALLAGHER, A.J., and
EMANUELLA D. GROVES, J., CONCUR