[Cite as *State v. Barker*, 2023-Ohio-453.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 111597 |
| ANDREW BARKER, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 16, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-650606-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Gregory Mussman, Assistant Prosecuting Attorney, *for appellee*.

Rick L. Ferrara, *for appellant*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Defendant-appellant, Andrew "Drew" Barker, appeals from his judgment of conviction, which was rendered after a jury trial. After a thorough review of the facts and pertinent law, we affirm.

**Procedural History and Facts**

{¶ 2} In 2020, Barker was charged in a seven-count indictment with two counts of murder, four counts of felonious assault, and one count of improperly discharging a firearm into a habitation. The counts all had one- and three-year firearm specifications.

{¶ 3} The matter proceeded to trial, and the jury convicted Barker of two counts of murder, unclassified felonies, one a violation of R.C. 2903.02(A) and the other a violation of R.C. 2903.02(B); two counts of felonious assault, in violation of R.C. 2903.11(A)(1); and one count of improperly discharging a firearm into a habitation, in violation of R.C. 2923.161(A)(1); and all attendant firearm specifications. The jury acquitted Barker of two counts of felonious assault, pursuant to R.C. 2903.02(A)(2), which alleged that Barker knowingly caused or attempted to cause physical harm by means of a metal pole.

{¶ 4} The trial court sentenced Barker to life in prison with the possibility of parole after 27 years.

{¶ 5} The charges resulted from the March 26, 2019 shooting death of Ivette Perez and injuries caused to Perez's 14-year-old daughter, G.T.[1]

{¶ 6} Ivette lived with her two daughters, J.G. and G.T., and her husband, Roberto Riviera, in a small two-story apartment building located on Lake Avenue in Cleveland; their apartment was 203.

---

[1] Juveniles are referred throughout by their initials in accordance with this court's policy. *See* Loc.App.R. 13.2.

{¶ 7} Christina Hernandez resided just below Ivette's apartment in apartment 103. Christina lived with her two daughters and her daughters' father, Darius Dobson. Christina was seven months pregnant with Barker's child at the time of the shooting. On the day of the shooting, Christina's sister, Diana, and three cousins, Z.S., B.E., and N.K., were at Christina's apartment.

{¶ 8} Christina and Ivette's families were not on friendly terms. On the afternoon of the shooting, an argument broke out between the two families. During the ensuing confrontation, which took place in the small hallway outside Ivette's apartment, Z.S. tried to punch shooting victim G.T., J.G. (Ivette's other daughter) grabbed a "fake BB-gun" and hit Christina over the head with it, and Ivette's hand or arm was injured. Witnesses described the scene as chaos, with "everyone" throwing punches. The fight ended when Ivette pushed her family back into their apartment. Christina and her family returned downstairs to their apartment.

{¶ 9} Ivette's husband, Riviera, returned home soon thereafter and saw the injury to Ivette's hand or arm, which was bleeding. He grabbed a black pipe or pole and went down to Christina's apartment. He banged on the door, but no one answered. Riviera returned to his apartment and called the police. According to Christina's sister, Diana, Riviera had a gun at one point during the events that took place that day.

{¶ 10} During this time, Christina called Barker, who told her to call the police. Barker arrived at the apartment complex in a white van about 10 – 15 minutes after the fight broke up between the two families. Barker was accompanied

by his dog and one to two other men, who may have been his sons, but who were never identified. He was armed with a shotgun and metal pole or pipe. Surveillance video, which was played for the jury and entered into evidence, showed that Barker was at the apartment complex for just over three minutes. Barker first went to Christina's apartment. He then went to Ivette's apartment and banged on the door, but her family refused to open the door so Barker went outside.

{¶ 11} By this time, Christina and some of her family members were also outside directly behind apartments 103 and 203. Ivette and G.T. were at the window watching, while Riviera was in the kitchen on the phone with the police. Ivette put up her middle finger and was yelling at Barker through the closed window. Barker pointed his shotgun at Ivette's window and fired a single shot. Barker fled the scene, leaving Christina and her children behind.

{¶ 12} The bullet pierced Ivette's hand and neck, fatally injuring her. She was hospitalized and survived for 11 days before succumbing to her injuries. The coroner testified that the shotgun pellets perforated Ivette's carotid artery. Part of her left hand was also shot, requiring amputation of her fingers. The coroner determined the cause of death to be acute pneumonia and respiratory failure and the manner of death as homicide. Fourteen-year-old G.T. was shot in the face and sustained serious injuries.

{¶ 13} At trial, Christina's then 13-year-old cousin N.K. testified that Barker had a gun when he arrived at the apartment complex. She testified he was holding the gun when he went upstairs to confront Ivette and was still holding it when he

went back downstairs and exited the building. N.K. heard Barker threaten to shoot the neighbors if they did not stop "flicking" him off. She saw Barker shoot at Ivette's apartment window. According to N.K., Ivette and her daughter were not armed.

{¶ 14} B.E., another of Christina's cousins, was interviewed by homicide detectives on June 22, 2020, more than a year after the shooting. During the interview, which was recorded, played for the jury, and entered into evidence, B.E. told police that Barker had a shotgun, warned the neighbors to stop taunting him, and fired the shotgun into the window when the neighbors would not stop. According to B.E., Barker did not have the shotgun when he first arrived but returned to his van to retrieve it.

{¶ 15} At trial, however, B.E. testified that she did not see who did the shooting or who was shot. When the state showed B.E. the video of her interview with police detectives, she admitted to what she told detectives. She then testified that "they," meaning Ivette's group, had a "little" gun. The prosecutor asked what Ivette's family was doing upstairs when Barker shot at them. B.E. testified, "they were just talking. They were still talking, still just being — trying to add on to the situation that had already deescalated." She further testified that after the initial confrontation with Ivette's family, she and other members of Christina's family went outside "because the situation had deescalated and we were leaving." According to B.E., speaking about Ivette,

They're yelling at us, waiving the gun around. Calling us names, still talking in Spanish, and then they — I think they like they aimed it back towards us * * * and started laughing, * * *.[2]

{¶ 16} Diana, Christina's sister, initially testified that she did not remember what happened on the day of the shooting. During her testimony, the state played the police body-cam video of Diana talking to responding officers shortly after the shooting.

{¶ 17} In the video, Diana told police, "I see he had a rifle * * * Drew went outside and I seen [sic] him lift it up and * * * he just shot it through the window * * * he just aimed for the back of the house."  Diana also used hand motions to mimic someone holding a shotgun or rifle and raising it.  She told police she saw the shooting because she was standing near Barker when it happened.  During her testimony, Diana said she did not know what she was saying at the time of the shooting because she was addicted to alcohol and pills but was sober at trial.

{¶ 18} Christina testified that she called Barker to come over after her confrontation with Ivette.  She testified that she was worked up after the initial fight and ready to fight again.  Christina remembered she saw Barker go outside and she heard a loud noise and glass shattering shortly thereafter.

{¶ 19} Victim G.T. testified that the downstairs neighbors came to her apartment to fight.  Z.S. attempted to punch G.T., but G.T. ducked.  J.G., G.T.'s sister, pulled out a BB gun and hit Christina in the head with it.  Ivette injured her

---

[2] During her testimony B.E. does not identify who "they" are from Ivette's family that allegedly had a gun and was waiving it around.

hand during the melee, and it was bleeding. Later, after they had returned to their apartment, they heard a loud knock at the door. G.T. looked out the peep hole and saw Barker. He threatened to kill everyone in the apartment. G.T. did not open the door. She and her mother went to look outside the window. G.T. saw the same man who had been at the door. He pointed the gun at G.T. and her mother, yelled "you p***," and fired. G.T. and her mother fell to the ground. Riviera, Ivette's husband, was in the kitchen on the phone with the police when the shooting occurred. G.T. was shot in the face.

{¶ 20} J.G., Ivette's other daughter, testified that both families participated in the fight in the hallway. J.G. admitted to hitting Christina over the head with a BB gun, but insisted it was "fake" and did not work. J.G. heard a loud knock at their apartment door about ten minutes after the fight ended and each family had retreated to their respective apartments. Her family refused to open the door so the man that had been at their door went outside to their side window. Her mother and sister were looking out the window; they were not armed.

{¶ 21} Barker testified in his own defense. Barker testified that Christina called him upset and he went over to her apartment, taking his dog and "people" that "love him and want to protect him and his family." He spoke with Christina and then went to confront Ivette. He testified that he had a pole in one hand and his dog on a leash in the other hand. He knocked at her door with the pole and shouted "come out here and show me your face. Come out here and talk to me," but no one opened the door. According to Barker, he decided to get his family "out," which

meant he was going to leave the area with Christina and her family. Barker insisted that he wanted to fight Riviera, because he thought he had beat up Christina, who was pregnant, and thought Riviera was armed.

{¶ 22} According to Barker, he heard a lot of commotion outside, so he went outside with his dog, holding the pole, to see what was going on. He saw people gathered around. He looked up and saw a woman in an upstairs window making gestures and a man standing behind her holding a gun. Barker testified that the gun "looked like it was getting pointed at me or one of the people that was down there * * * it was facing in our direction." He thought the man might want to shoot him so he threw the pole he was holding, since "I could not throw my dog up there, so I had to use the next best thing." According to Barker, he heard a boom and thought it was a gunshot and he fled, leaving Christina and her family behind.

{¶ 23} Inside Ivette's apartment, the police located a BB gun on top of an open drawer in a bedroom, a silver pole or pipe with blood on it, and the black pipe witnesses said Riviera had. The shotgun was never recovered. A warrant was issued for Barker's arrest on April 26, 2019, but he was not arrested until May 7, 2020. During his 90-minute interview with homicide detectives, which was recorded, played for the jury, and entered into evidence, Barker denied having a shotgun or shooting Ivette and G.T. Barker, who waived his right to an attorney present during the interview, insisted he went to Christina's apartment because a man had a gun and had hit her with the gun. Barker wanted the man to fight him. According to Barker, "I made sure that if something was going to happen, I was going to diffuse it

to protect me.  I had whatever weapon I had to protect me," but never admitted he had a gun.

## Assignments of Error

I.  The State of Ohio was relieved of its obligation to prove beyond a reasonable doubt that appellant did not act in defense of another, therefore depriving appellant of due process under the laws of Ohio and the United States.

II. The state presented both insufficient evidence of appellant's guilt of murder and insufficient evidence to overcome appellant's established claim of self-defense.

III. The manifest weight of evidence did not support a conviction of Appellant of Counts 1 through 5.

IV. The sentencing under Ohio law violated the separation of powers doctrine of the Constitutions of the State of Ohio and United States, due process of law, are void for vagueness, and conflict internally with other Ohio law.

## Law and Analysis

## No Plain Error in Jury Instructions

{¶ 24} In the first assignment of error, Barker argues that the trial court failed to properly instruct the jury on the affirmative defense of self-defense.

{¶ 25} As to self-defense, the court instructed the jury, in part:

Self-defense, use of deadly force.  General.  A person is allowed to use deadly force in self-defense.  The State must prove beyond a reasonable doubt that the Defendant, when using deadly force, did not act in self-defense.

The State's proof. To prove that the Defendant's use of deadly force was not in self-defense, the State must prove beyond a reasonable doubt at least one of the following:

(A) the Defendant was at fault in creating the situation giving rise to the shooting which occurred at the home of Ivette Perez, also known as Gonzalez, on March 26, 2019; or [(B),] the Defendant did not have reasonable grounds to believe that he was in immediate danger of death or great bodily harm; or (C), that the Defendant did not have an honest belief, even if mistaken, that he was in immediate danger of death or great bodily harm; or (D), the Defendant violated a duty to retreat to avoid the danger; or (E), the Defendant used unreasonable force.

The Defendant did not act in self-defense if the State proved beyond a reasonable doubt that the Defendant was at fault in creating the situation that resulted in the death. The Defendant was at fault if the Defendant was the initial aggressor and Ivette Perez did not escalate the situation by being the first to use or attempt to use deadly force; or the Defendant provoked Ivette Perez into using force; or [ ] the Defendant did not withdraw from the situation; * * * .

{¶ 26} In instructing the jury on self-defense, the trial court also defined the following terms and their application to self-defense: reasonable grounds, honest belief, no duty to retreat, substantial risk, words, unreasonable force, and greatly disproportionate.

{¶ 27} Barker did not object to the trial court's jury instruction on self-defense. He nevertheless argues on appeal that the trial court erred in instructing the jury on self-defense by omitting the instruction on defense of another because there was evidence that he was acting in defense of another, namely Christina and her family, which Barker referred to as his family.

{¶ 28} In considering a claim of plain error based on defective jury instructions, "an appellate court must review the [jury] instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions." *State v. Nicholson*, 8th Dist.

Cuyahoga No. 110595, 2022-Ohio-2037, ¶ 137, citing *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45. An improper or erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial would clearly have been different. *Nicholson* at *id.*, citing *State v. Davis*, 8th Dist. Cuyahoga No. 109890, 2021-Ohio-2311, citing *State v. Cooperrider*, 4 Ohio St.3d 226, 448 N.E.2d 452 (1983). Therefore, Barker must demonstrate that his convictions for murder, felonious assault, and improper discharge into a habitation clearly would have been different had the trial court instructed on the affirmative defense of another. *See State v. Gay*, 8th Dist. Cuyahoga No. 86944, 2006-Ohio-3683, ¶ 19 (finding that there was substantial evidence of defendant's guilt and defendant was unable to show that his conviction would have been different had the trial court instructed on the affirmative defense of defense of another).

{¶ 29} A self-defense claim includes the following elements:

(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 15*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).

{¶ 30} The self-defense instruction the trial court gave to the jury accurately defines the elements a defendant must establish to show he or she acted in self-

defense. Reviewing all the evidence presented after being instructed, the jury clearly did not find Barker's version of events credible enough to sustain his affirmative defense. In *Gay*, this court noted that "'[t]he right of a person to defend another ordinarily should not be greater than such person's right to defend him [or her]self.'" *Id.* at ¶ 24, quoting *State v. Wenger*, 58 Ohio St.2d 336, 390 N.E.2d 801 (1979).

{¶ 31} Barker cites *State v. Speakman*, 4th Dist. Pickaway No. 00CA035, 2001-Ohio-2437, for the proposition that the trial court committed plain error in failing to instruct the jury on defense of another. In *Speakman*, the court determined that a combination of errors, which included an incomplete jury instruction on defense of another, were prejudicial to the appellant and remanded the case for a new trial. *Id.* at ¶ 14.

{¶ 32} *Speakman* is distinguishable. The appellant in *Speakman* objected to the incomplete jury instruction; therefore, the appellate court was not reviewing for plain error. Additionally, the facts of the case differ greatly. In *Speakman*, the appellant was on scene and either saw the initial confrontation or was part of the initial confrontation as part of a series of events that included appellant hitting the victim over the head with his crutch. In this case, there was a break in the chain of events — the families had each retreated to their respective apartments — before Barker arrived on scene and shot Ivette and G.T.

{¶ 33} The jury was presented with a substantial amount of evidence in support of the state's version of the evidence that Barker went over to Christina's

apartment to assess the situation with her neighbors, bringing one or two cohorts, his dog, a shotgun, and a metal pipe. Barker went up to Ivette's apartment, but the family refused to open the door. So Barker went outside and when Ivette would not stop taunting him, he used a shotgun to shoot from the ground into a second-story window at Ivette and her teenage daughter, both of whom were unarmed, mortally wounding Ivette and seriously injuring G.T. Two people related to Christina's side of the family admitted Barker had a gun. N.K., who was 13 at the time of the shooting, confirmed Barker had a gun. Diana, Christina's sister, informed the police that Barker had a shotgun and used it to shoot into the second-story window.

{¶ 34} Barker, in contrast, testified that he used a metal pole to defend himself after seeing a man in the window with a gun and thinking he was going to get shot. After weighing the evidence, the jury did not find in favor of Barker's self-defense argument. It is therefore logical to conclude that the jury did not find Barker's version of events credible. In that case, there would be no difference in the verdict had the trial court instructed on defense of another. *Gay*, 8th Dist. Cuyahoga No. 86944, 2006-Ohio-3683, at ¶ 25. We do not find that the jury's decision would clearly have been different but for the alleged error in the trial court's charge to the jury.

{¶ 35} At oral argument, counsel for Barker argued that Barker was merely ushering his family out of their apartment when he was faced with a man on the second floor holding a gun and had to defend his family by shooting at the window. Throughout, though, Barker denied he possessed or used a firearm. Although

Barker claims he is making this argument in the alternative, this court understands how the jury did not believe Barker's claims of self-defense when Barker maintained he never shot anyone. Moreover, Barker's own testimony contradicts his claim of he was defending his family. When the prosecutor asked Barker why he threw the metal pole up through the window, Barker answered, "Because I was fearing for my life." When Barker fled, he left Christina and her family, except for B.E., behind.

{¶ 36} At oral argument Barker's counsel also raised an argument regarding ineffective assistance of trial counsel because defense counsel did not object to the jury instructions. The argument was not raised in his brief on appeal and is therefore waived. *See* App.R. 12(A)(2) and App.R. 16(A).

{¶ 37} The trial court did not commit plain error in failing to instruct the jury on defense of another. Accordingly, Barker's first assignment of error is overruled.

**Evidence Sufficient to Support Conviction; Conviction Not Against Manifest Weight of the Evidence**

{¶ 38} In the second assignment of error, Barker contends that the evidence was insufficient to support the conviction. In his third assignment of error, he contends that the conviction was against the manifest weight of the evidence. We combine these assignments of error because they are interrelated.

{¶ 39} "A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. Parker*, 8th Dist. Cuyahoga No. 110716, 2022-Ohio-1237, ¶ 7, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry in

a sufficiency challenge is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime existed beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When making a sufficiency determination, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supports the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at *id.* Under a sufficiency challenge, witness credibility is immaterial; the appellate court must defer to credibility determinations of the trier of fact and only review issues of law. *Parker* at *id.*

{¶ 40} A manifest weight challenge and a sufficiency of the evidence challenge are two distinct challenges to the evidence presented. *State v. Miree*, 8th Dist. Cuyahoga No. 110749, 2022-Ohio-3664, ¶ 30, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. A challenge to the manifest weight of the evidence "'involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins* at *id.* Weight of the evidence examines "'the evidence's effect of inducing belief.'" *Harris* at *id.*, quoting *Wilson* at *id.*, citing *Thompkins* at 386-387. In reviewing a manifest weight claim, the court must consider all the evidence in the record, the reasonable inferences drawn from it, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice * * *.'" *Harris* at *id.*,

quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). The discretionary power to grant a new trial should be reserved for exceptional cases where "'the evidence weighs heavily against the conviction.'" *Thompkins* at *id.*, quoting *Martin* at 175. More succinctly, the sufficiency of the evidence standard of review applies to a party's burden of production and a manifest weight of the evidence standard of review applies to a party's burden of persuasion. *Messenger*, Slip Opinion No. 2022-Ohio-4562, at ¶ 26, citing *State v. Messenger*, 2021-Ohio-2044, 174 N.E.3d 425, ¶ 44-45 (10th Dist.).

{¶ 41} Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. Mack*, 8th Dist. Cuyahoga No. 109514, 2021-Ohio-1102, ¶ 17, citing *State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2015-Ohio-1946, ¶ 11. Therefore, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Burgos*, 2022-Ohio-3919, 199 N.E.3d 1158, ¶ 41 (8th Dist.), citing *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161.

{¶ 42} Barker was convicted of murder under R.C. 2903.02(A) and 2903.02(B), which provide in relevant part, that no person shall purposely cause the death of another (R.C. 2903.02(A)) and "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit

an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B).

{¶ 43} The underlying felony Barker was convicted of was felonious assault under R.C. 2903.11(A)(1) against Ivette. Barker was also convicted of felonious assault against G.T. under that same subsection, which provides in relevant part that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." Barker was convicted of improperly discharging a firearm into a habitation under R.C. 2926.131(A)(1). That section provides that "no person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual." Finally, Barker was convicted of the attendant one- and three-year firearm specifications.

{¶ 44} Barker has two main arguments: (1) he did not purposely shoot Ivette and (2) the state failed to show he was not acting in self-defense.

{¶ 45} A person commits murder by purposely causing the death of another. R.C. 2903.02(A). An act is committed "purposely" when it is a person's specific intent to cause a certain result. R.C. 2901.22(A). "Intent may be inferred from the circumstances surrounding the crime." *State v. Mathis*, 8th Dist. Cuyahoga No. 91830, 2009-Ohio-3289, ¶ 3, citing *State v. Herring*, 94 Ohio St.3d 246, 266, 2002-Ohio-796, 762 N.E.2d 940. Because intent dwells in the mind of the accused, an intent to act can be proven from the surrounding facts and circumstances. *Mathis* at *id.*, citing *State v. Treesh*, 90 Ohio St.3d 460, 484-485, 739 N.E.2d 749 (2001). In *Mathis*, this court noted that

[a]n intent to kill may be presumed where the natural and probable consequence of a wrongful act is to produce death, and such intent may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound.

*Id.*, citing *State v. Robinson*, 161 Ohio St. 213, 118 N.E.2d 517 (1954), paragraph five of the syllabus. "A firearm is an inherently dangerous instrumentality, the use of which is likely to produce death." *Mathis* at *id.*, citing *State v. Seiber*, 56 Ohio St.3d 4, 14, 564 N.E.2d 408 (1990).

{¶ 46} Barker arrived on scene after Christina's and Ivette's families had retreated into their respective apartments. By the time Barker arrived at the apartment complex, the altercation between the families had been over for 10-15 minutes. Barker went to Ivette's apartment with one to two men, his dog, and a weapon. G.T. testified that Barker yelled, "Come out, all of you. I'm going to kill all of you that are there." When Ivette's family refused to open the door, Barker took his shotgun and went outside. Multiple witnesses, including his girlfriend's sister and cousin, saw Barker holding a shotgun. Barker aimed his shotgun at the window and fired the gun into the window where Ivette was standing. Diana testified she was standing next to Barker when he lifted the shotgun and fired through Ivette's apartment window; Diana mimicked for the officers the action of raising a large rifle or shotgun to show them how Barker shot his gun into the apartment window. Thus, there was ample evidence that Barker acted with purpose.

{¶ 47} Next, Barker argues that there was insufficient evidence that he did not act in self-defense. Barker's argument is displaced. The sufficiency of the

evidence standard relative to self-defense applies to Barker's burden, not the state's burden. Barker has the burden of producing sufficient evidence he acted in self-defense. He did so and the trial court gave the jury an instruction on self-defense. *See State v. Messenger*, 2022-Ohio-4562, at ¶ 26 ("[T]he trial court provided the jury with an instruction regarding self-defense, which means that the trial court concluded that Messenger put forward sufficient evidence that he was acting in self-defense when he shot and killed Pack."). *See also State v. Claytor*, 8th Dist. Cuyahoga No. 110837, 2022-Ohio-1938, ¶ 67, citing *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685 ("The sufficiency of the evidence standard only applies to elements the state must prove during its case in chief, not the affirmative defense of self-defense.").[3]

{¶ 48} Barker also contends that the state did not prove that he was not acting in self-defense. In the context of self-defense, the state has the burden of disproving Barker's claim beyond a reasonable doubt. *Messenger* at ¶ 27. The state only needs to prove one of the three elements — that Barker was at fault in creating the situation giving rise to the affray; that he lacked a bona fide belief that he was in imminent danger of death or great bodily harm or that another means of escape from such danger existed negating the need for the use of deadly force; or that he violated a duty to retreat or avoid the danger — beyond a reasonable doubt to

---

[3] At oral argument, counsel for Barker conceded that *Messenger* was applicable to the case at bar and the sufficiency of the evidence standard does not apply to the affirmative defense of self-defense.

establish that self-defense does not apply. *Claytor* at ¶ 81, citing *State v. Travis*, 8th Dist. Cuyahoga No. 110514, 2022-Ohio-1233.

{¶ 49} Barker argues that the state could not meet its burden of persuasion because the police located a gun found in Ivette's apartment, which supported his argument that a man, presumably Riviera, pointed a gun at him through the window and he acted in self-defense. He also points to conflicting witness testimony.

{¶ 50} As stated previously, Barker has not shown that he was in fear of death or imminent great bodily harm to himself or others to warrant his use of deadly force. Barker arrived at the apartment building 10 – 15 minutes after the confrontation between Christina's and Ivette's families ended and both families had retreated to their respective apartments. When Barker arrived on scene, there was no imminent threat to Christina or Christina's family. Barker went to Ivette's apartment, but the family refused to open the door. At this point, there was no imminent threat to Barker, Christina, or Christina's family. Barker then went outside with his shotgun. By all accounts Ivette raised her middle finger at Barker and yelled at him, through a closed window. Although Barker testified that Riviera was also at the window and had a gun, the jury clearly did not believe his version of events over the numerous witnesses that testified or told police that the people at the window were unarmed. Then, Barker raised his shotgun from his position on the ground up into the closed apartment window, shooting, hitting, and mortally wounding Ivette and seriously injuring her daughter, G.T.

{¶ 51} The guilty verdicts on two counts of murder, two counts of felonious assault, and one count of improper discharge into a habitation show that the jury was not left with reasonable doubt. Moreover, the not guilty verdicts on felonious assault with a pipe show that the jury did have reasonable doubt as to two of the counts in the indictment. Although there was some inconsistency in witness testimony, the jury was able to assess the credibility of the witnesses and assign the proper weight to each witness's testimony. The jury chose to believe the state's version of events, bolstered by the testimony of witnesses from both families, and disbelieve Barker's testimony that he threw a metal pipe at the second-story window to defend himself.

{¶ 52} The weight of the evidence did not support a self-defense theory and Barker's convictions were not against the manifest weight of the evidence. His convictions, therefore, were also supported by sufficient evidence.

{¶ 53} The second and third assignments of error are overruled.

**The Reagan Tokes Law is Constitutional**

{¶ 54} In the fourth assignment of error, Barker argues that the trial court erred by imposing an indefinite sentence and challenges the constitutionality of S.B. 201's indeterminate sentencing provisions. He contends that the Reagan Tokes Law violates state and federal constitutional provisions for the right to a jury trial, the separation-of-powers doctrine, and due process. Barker concedes the same arguments were rejected in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), and thus it appears his argument is advanced to preserve the claim for

further review. Based on the authority established by this district's en banc holding in *Delvallie*, Barker's sentence does not violate his constitutional rights with respect to the challenges presented. The fourth assignment of error is overruled.

**Conclusion**

{¶ 55} The trial court did not commit plain error in the self-defense instruction it gave to the jury. Barker's convictions for murder, felonious assault, and improper discharge of a firearm into a habitation were not against the manifest weight of the evidence and were therefore also supported by sufficient evidence. Finally, the trial court did not err in imposing an indefinite sentence under the Reagan Tokes Law.

{¶ 56} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

EILEEN T. GALLAGHER, P.J., and
EMANUELLA D. GROVES, J., CONCUR


N.B. Judge Eileen T. Gallagher joined the dissent by Judge Lisa B. Forbes in *Delvallie* and would have found that R.C. 2967.271(C) and (D) of the Reagan Tokes Law are unconstitutional.

Judge Emanuella D. Groves concurred with the opinions of Judge Lisa B. Forbes (dissenting) and Judge Anita Laster Mays (concurring in part and dissenting in part) in *Delvallie* and would have found the Reagan Tokes Law unconstitutional.