[Cite as *State v. Smith*, 2023-Ohio-1296.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 111593 |
| v. | : | |
| KEVIN SMITH, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 20, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652459-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Gregory Mussman and Poula Hanna,
Assistant Prosecuting Attorneys, *for appellee.*

Robert A. Dixon, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1}   Defendant-appellant, Kevin Smith ("Smith"), appeals his murder and
felonious assault convictions.  Smith contends the trial court improperly charged the
jury regarding self-defense and failed to provide a verdict form regarding self-

defense; there was insufficient evidence to sustain the state's burden to disprove self-defense; his convictions are against the manifest weight of the evidence; and trial counsel was ineffective for failing to object to the jury instructions and verdict forms. For the reasons set forth below, we affirm.

## I.    Facts and Procedural History

{¶ 2}    This appeal stems from the fatal shooting of Jason Pulley ("Pulley"), which took place on the evening of May 7, 2020, in the HP gas station parking lot located at 13900 Kinsman Avenue in Cleveland. As a result of this shooting, Smith was charged in a four-count indictment. Count 1 charged Smith with aggravated murder in violation of R.C. 2903.01(A).[1] Count 2 charged him with murder in violation of R.C. 2903.02(B).[2] Count 3 charged Smith with felonious assault, a felony of the second degree, in violation of R.C. 2903.11.[3] Each of Counts 1-3 carried one- and three-year firearm specifications. Count 4 charged Smith with having weapons while under disability ("HWWUD") in violation of R.C. 2923.13(A)(3).[4]

---

[1] "No person shall purposefully, and with prior calculation and design, cause the death of another * * *."

[2] "No personal shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

[3] "No person shall knowingly * * * cause serious physical harm to another * * *."

[4] "[N]o person shall knowingly acquire, have, carry, or use any firearm * * * if * * * the person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse * * *."

{¶ 3} The matter proceeded to a jury trial in March 2022.[5] Throughout the trial, Smith did not dispute that he shot and killed Pulley. Rather, Smith claimed he acted in self-defense. The following relevant evidence was adduced at trial.

{¶ 4} Pulley's girlfriend, Jameana Holly ("Holly"), testified that Pulley ran a landscaping company and was "a wonderful person":

> He was very giving, very compassionate. He loved his family. He — up until his death, he took care of his mother. He was very oriented. He loved his kids. He loved the community. He bought a lot of the less fortunate kids bikes and shoes and stuff of that nature.

(Mar. 7, 2022, tr. 251.) Holly further testified that Pulley was licensed to carry a firearm, had multiple guns, and regularly carried a gun.

{¶ 5} On the night of the shooting, Pulley was at Holly's house, which is located about a minute away from the gas station where the incident occurred. Pulley and Holly ordered dinner and planned to stay in for the night. Pulley's business cell phone kept ringing. After about four or five calls, Pulley answered the phone. Pulley became "agitated," "animated," and "irritated," which Holly described was "not his normal" behavior. Pulley was gesturing and yelling about how an individual named "Kev" needed to worry about himself. Holly did not know who "Kev" was. Pulley got dressed and sat in the car in Holly's driveway for about three minutes before he left. Holly did not know where he went.

{¶ 6} The lead investigator, Cleveland Police Detective David Shapiro ("Lead Detective"), testified that the last phone number that called Pulley and the

---

[5] Count 4 was tried before the bench.

last phone number that Pulley called belonged to a person named Ashley Rox ("Rox"). The state made efforts to have Rox testify at trial, however, she was "nowhere to be found." The Lead Detective testified that he learned that Rox's phone number was associated with Smith through another agency.

{¶ 7} Thomas Ciula ("Audiovisual Forensics Expert"), head of the Cleveland Division of Police's forensic video laboratory for the homicide unit, presented surveillance video composites from the HP gas station and Mount Pleasant, a location across the street. The videos were played for the jury and showed Smith arriving at the crowded gas station, waiting for a spot to open, pulling up to a gas pump despite the gas tank being on the opposite side of his vehicle, continuing to wait inside, and talking briefly to another patron. About 13 minutes after Smith's arrival, Smith exited his vehicle as Pulley pulled into the back of HP's parking lot behind the gas pumps.

{¶ 8} Smith waved as he walked toward Pulley's vehicle. Smith was holding objects in each hand. On cross-examination, the Audiovisual Forensics Expert agreed that the objects appeared to be consistent with a drink and possibly a cell phone. An unidentified individual also approached Pulley's vehicle but walked away shortly after.

{¶ 9} The events that follow were not captured on video due to the location of the cameras. However, four flashes can be seen on the Mount Pleasant surveillance footage before Pulley is observed falling to the ground. The Lead Detective testified that the flashes in the video were consistent with muzzle flashes.

The state's witnesses acknowledged that the footage does not reveal whether Pulley or Smith was "the aggressor."

{¶ 10} Smith jogged back to his vehicle with a different object in his right hand. The Audiovisual Forensics Expert testified it was a "right angled object" consistent with a firearm. After getting in his car, Smith quickly drove away from the scene. That same evening, Smith's vehicle was found crashed into a tree with heavy damage about a block and half away from the gas station on Melzer Road. The Lead Detective testified that Smith fled both the scene of the shooting and the scene of the crash.

{¶ 11} Cleveland Police Officer Alexander Cole ("Officer Cole") responded to a call regarding the motor vehicle accident on Melzer Road. Officer Cole observed a silver and black handgun located on the passenger floorboard of Smith's vehicle at the scene of the crash. Cleveland Police Detective Troy Edge ("Detective Edge") processed Smith's vehicle after it was towed from the accident scene. Detective Edge collected a black and silver Davis .380 caliber semiautomatic handgun from the vehicle along with other items and swabs from the interior of the car to test for DNA. According to Lisa Moore ("DNA Analyst"), a DNA analyst for the Cuyahoga County Medical Examiner's Regional Forensic Science Laboratory, Smith's DNA was matched to swabs collected from the grip and trigger of the Davis .380 caliber handgun.

{¶ 12} Edward Lattyak ("Firearms and Ballistics Expert"), a firearms section supervisor at the Cuyahoga County Medical Examiner's Crime Laboratory, testified

that the Davis .380 caliber handgun was operable but in "very bad condition." "It came in * * * with a large crack on the slide running across the top of the slide and so immediately we determined that this gun would be unsafe to fire in its present condition without taking some precautions." (Mar. 9, 2022, tr. 430-431.) To obtain test fired bullets for comparison, the Firearms and Ballistics Expert shot the .380 caliber gun with a different slide as well as with the original slide taped.

{¶ 13} Cleveland Police Detective Demetrius Madison ("Detective Madison") arrived at HP within a minute of the shooting. He was already on his way to the gas station for another call when he heard the gunshots. Detective Madison rendered first aid to Pulley before EMS arrived and transported him to the hospital. Detective Madison also located a black Smith & Wesson .40 caliber handgun approximately five feet away from Pulley's body.

{¶ 14} Detective Todd Clemens documented, collected, and preserved the Smith & Wesson .40 caliber handgun, amongst other items, from the scene of the shooting. The Smith & Wesson .40 caliber handgun was loaded with a bullet in the chamber of the gun and its safety off. The Lead Detective testified Pulley had the legal right to carry a gun. The Lead Detective also testified, "We did not recover any evidence related to that 40 caliber, meaning there were no spent casing for the 40 caliber." (Mar. 9, 2022, tr. 524.)

{¶ 15} The DNA Analyst testified that Pulley's DNA was matched to swabs collected from the grip, trigger, and magazine of the Smith & Wesson .40 caliber gun while Smith's DNA was not detected. Four .380 caliber cartridge casings were also

collected from the HP gas station. According to the "Firearms and Ballistics Expert" results were inconclusive as to whether the casings were discharged by Smith's Davis .380 caliber handgun.

{¶ 16} Cleveland Police Detective Thelemon Powell ("Detective Powell") testified about the processing of Pulley's vehicle. Some of the evidence collected included an unloaded assault rifle magazine and a box containing 5.56 caliber live rounds. An assault rifle was not present and the rounds would not fit inside the Smith & Wesson .40 caliber gun located by Pulley's body. The unloaded magazine and box of live rounds were legal because Pulley was a concealed carry permit holder. Packaged bags of marijuana that could be sold were also located in Pulley's vehicle. A gray face mask with a defect or hole was collected from the driver's side door. One spent casing was located inside the mask. There was no blood in vehicle.

{¶ 17} Detective Powell also testified that the area was very dangerous and violent; it was not uncommon for people to carry guns. The HP gas station was not just a place where people filled up their gas tanks; it was a place where people would hang out, congregate, and meet. Drugs were sometimes sold at the gas station and several homicides had occurred at HP within the last few years.

{¶ 18} Dr. Joseph Felo ("Dr. Felo"), a forensic pathologist and the chief deputy medical examiner for Cuyahoga County, testified about Pulley's autopsy findings. Dr. Felo's Report of Autopsy, marked as State's exhibit No. 256, indicated that Pulley was 39 years old, 71 inches tall, and weighed 308 pounds at the time of his death. Pulley was shot twice in the left chest, with the bullet travelling

downward; once in his left upper arm, with the bullet travelling upward and breaking his upper arm bones, humerus, and front portion of his shoulder blade; and once in his back between his shoulder blades just left of his thoracic spine, severing his spinal cord and causing immediate paralysis of his legs.

{¶ 19} Curtis Jones ("Trace Evidence Expert"), supervisor of the Cuyahoga County Medical Examiner's trace evidence unit, testified that one of the shots to Pulley's chest was fired from an intermediate range between a foot to four or five feet. The shot to Pulley's left upper arm was fired from a close proximity, meaning less than a foot away but without contact. The shot to his back was determined to be a contact wound by both Dr. Felo and the Trace Evidence Expert. The Lead Detective testified the shot to Pulley's back was a debilitating and it was unlikely Pulley was facing the shooter when he received this contact wound to the middle of his back.

{¶ 20} Dr. Felo further testified that Pulley's wounds would not have caused much bleeding or blood spatter. The order of the shots and the position of Pulley's body at the time of their infliction were indeterminable. Three bullets were collected from Pulley's body. The Firearms and Ballistics Expert testified that two of the bullets were identified as having been fired by Smith's Davis .380 caliber handgun while the other was damaged and inconclusive.

{¶ 21} Dr. Felo also testified that Pulley was positive for tobacco products; a break-down product of cocaine, indicating historical use; and active and historical cannabinoids, indicating Pulley was both previously and recently exposed to

marijuana. Pulley's cause of death was multiple gunshot wounds, and the manner of death was homicide.

{¶ 22} The DNA Analyst testified that Smith's DNA was not located underneath Pulley's fingernails or on Pulley's hands, palms, or knuckles. The Trace Evidence Expert testified that gunshot primer residue was identified on Pulley's hands. However, it is unknown whether the residue was deposited from Pulley discharging a firearm, being in close proximity to the discharge of a firearm, or being in contact with an object that had gunshot primer residue on it. No trace metal was detected on Pulley's hands; however, a negative result is not a conclusive finding that a metal object was not handled.

{¶ 23} After the state rested, the trial court considered Smith's arguments regarding his claim of self-defense and found insufficient evidence of self-defense had been presented thus far for an instruction to be given to the jury. Smith moved for a Crim.R. 29 acquittal on Counts 1 through 3. The trial court denied the motion as to each count. In light of the court's ruling, Smith took the stand. He was the sole witness on his behalf.

{¶ 24} Smith testified that he and Pulley knew each other; they grew up in the same community together. Smith further testified that he dated Rox on and off for about seven or eight years. He stated:

[STATE]: So it didn't make you very happy to hear that Jason Pulley was sleeping with Ashlee Rox, did it?

[SMITH]: Don't bother me. I know a lot of people sleep with Ashlee.

[STATE]:    Okay. So you knew that they were in a relationship.

[SMITH]:    I didn't know that.

[STATE]:    You didn't?

[SMITH]:    No, I didn't.

[STATE]:    But you knew Jason Pulley.

[SMITH]:    I knew Jason Pulley.

(Mar. 10, 2022, tr. 605.)  Smith further testified:

[STATE]:    Underneath your neck there, I mean, you have Ashlee's name tattooed on your neck, correct?

[SMITH]:    Absolutely. I got — I got a lot of tattoo names, Ashlee, Paradise, Tamara, Valerie.

[STATE]:    So the guy that was sleeping with your girl you were just cool with?

[SMITH]:    I mean, how did I know that he was sleeping with her? I didn't know.

(Mar. 10, 2022, tr. 608.)

{¶ 25} Smith said he talked to Pulley earlier because he wanted to buy some marijuana from Pulley.  Smith testified:

[STATE]:    So, were you using Ashlee's phone to bring him in here? Is that what the call came —

[SMITH]:    No.

[STATE]:    Why did Ashlee call him, do you know?

[SMITH]:    I don't — I don't know.

[STATE]:    So how did you call him? What number were you using?

[SMITH]: I don't have the number in front of me, sir. I don't remember the numbers.

[STATE]: Okay. So you don't have the number that you used to call —

* * *

[STATE]: So, I mean, just like you said, this was an important time. I'm trying to get to the details here. You don't remember what number you had to call Jason Pulley?

[SMITH]: I can't — I can't remember the number.

(Mar. 10, 2022, tr. 607.) Smith further testified:

Yeah. I had talked to him earlier, but he was taking so long, that I had something to do, so I had left and grabbed some — grabbed some clothes that I needed. You know, I had left, grabbed some clothes.

(Mar. 10, 2022, tr. 581.) Smith said that he went to the HP gas station "to see if I seen Mr. Pulley so that I can buy some weed." (Mar. 10, 2022, tr. 583.) When he arrived at the gas station, Smith waited for a pump to open and pulled in. He asked another gas station patron about marijuana because Pulley was not there. Smith testified:

[STATE]: Okay. So Jason Pulley decides to stop what he's doing to come out to sell you some — a little bit of weed?

[SMITH]: Exactly what the — what the — what the lady — the State witness have said earlier, that he got up, he left the house and he came, said that he was meeting Kev.

[STATE]: You weren't trying to squash any beef?

[SMITH]: It wasn't a beef to squash, that I knew. We didn't have any type of problem.

(Mar. 10, 2022, tr. 607-608.)

{¶ 26} When Pulley arrived, Smith waved to Pulley and walked to the back of the gas station where Pulley had parked. Smith testified, "It wasn't like I was trying to sneak up." (Mar. 10, 2022, tr. 586.) When asked whether he thought there was a problem between him and Pulley, Smith testified: "For what? You know, I — you know that you are here to sell me the weed. Like, what could the problem be?" (Mar. 10, 2022, tr. 586.) He was "not at all [angry that night before meeting with Mr. Pulley]" and had "[n]o intention at all of fighting him" and "[n]o intentions at all to kill him." (Mar. 10, 2022, tr. 584.) He further testified, "I had no idea that me and this man had any problem. No idea." (Mar. 10, 2022, tr. 600.)

{¶ 27} Smith said that the Davis .380 caliber handgun he was carrying was cracked the night of the shooting. Smith was not concerned about it being unsafe to fire because "I wasn't — never really planning on ever really using the gun." (Mar. 10, 2022, tr. 585.) The Davis .380 caliber handgun was in Smith's waistband when he walked toward Pulley. Smith testified a water bottle was in his left hand and a cell phone was in his right.

{¶ 28} Smith, with his attorney, visually demonstrated what happened when Smith arrived at Pulley's vehicle. Smith claimed that Pulley pulled out a gun, cocked it, and put the gun to his face. Smith also claimed that Pulley grabbed and slung him towards the vehicle so hard that the water bottle and cell phone fell out of his hands. Smith testified that Pulley cursed at him and said, "Get your ass here * * * before I kill you." (Mar. 10, 2022, tr. 587-588.) Smith testified:

> At that point I knew nothing what he was talking about. I had no clue about nothing, what he was saying or what was going on.
>
> \* \* \*
>
> As he got me, I — I keep replying, "Brother, what did I do? What happened?" That was — that was — when he — when he grabbed me, he yanked me so hard that the cup and the cell phone \* \* \* fell out of my hand.

(Mar. 10, 2022, tr. 588.)

{¶ 29} Smith claimed that Pulley pointed the gun at the unidentified individual that approached them and told him to "[g]et out here before I shoot you, too." (Mar. 10, 2022, tr. 588-589.) While Pulley was cursing and yelling at this unknown individual, Pulley held the gun towards Smith. Smith reached for his own gun, pulled it from his waistband, and shot Pulley. Smith explained:

> [W]hen he bring his and back up, he bring his hand back down and goes to raise it up, but as he goes to raise it up, I had the gun in my hand.
>
> \* \* \*
>
> And I — I was so scared, he — he — so he about to kill me, so I — I shot him.
>
> \* \* \*
>
> Shot, boom. One shot. I can't remember all the shots. But he grabbed me. When he grabbed me, he pushed me up against the truck.
>
> \* \* \*
>
> And as he pushed me up against the truck he had his arm like this on my neck (indicating.)
>
> \* \* \*

I shot again.  I reached behind and shot again.

\* \* \*

He fell back.

(Mar. 10, 2022, tr. 590-591.)

{¶ 30} On cross-examination, Smith admitted he was not legally allowed to carry a firearm because he was a convicted felon.  He again reenacted the events that took place behind Pulley's vehicle:

[STATE]:  So you come out. I'll be you.  You said Mr. Pulley comes up, he racks it, and then puts the gun at you?

[SMITH]:  He puts the gun to my face.

[STATE]:  So to your face right here?

[SMITH]:  Standing in front of me.  Put the gun to my face, yes, sir.

[STATE]:  Okay.  So then you said you start pop, pop, pop, and you're stepping back. I saw you do that.

[SMITH]:  You say —

[STATE]:  How do you — how do you start firing?  So you said the first shot.

[SMITH]:  Yes.

[STATE]:  And then you don't remember the rest?

[SMITH]:  Like I explained to you, when he touched — when his hand went into the doorway, the door was open, his hand went into his doorway —

\* \* \*

[SMITH]:  The car door was opened.  As his hand come — hits the doorway, he push back toward — he push me back up

against the car.  He was outside — he was, like, outward towards the car, and he had me placed up towards the car like this (indicating).

[STATE]:  So he hemmed you up on the car?

[SMITH]:  Hemmed me up on the car.

[STATE]:  Okay.  So you're right here.  Mr. Hanna is you, hemmed up on this car right here.

[SMITH]:  Hemmed up on his car.

[STATE]:  Right hand Mr. Pulley is hemming you up?

[SMITH]:  His left.

[STATE]:  Left?

[SMITH]:  Absolutely.

[STATE]:  Right here.

[SMITH]:  Absolutely.

[STATE]:  All right.  So walk us through.  What do you do?

[SMITH]:  Okay.  He — he — as he — my hand is holding that right hand.

[STATE]:  Okay.

[SMITH]:  My left hand — is that left hand?  Holding his right — holding that right hand. Come on, man.  My — my — my left hand is holding his right hand from being wrung up.

* * *

[SMITH]:  This is the left hand.

[STATE]:  Okay.

[SMITH]:  Right hand.

[STATE]:    Okay.

[SMITH]:    Just like this (indicating).

[STATE]:    Okay.

[SMITH]:    That's how it is.

[STATE]:    All right.

[SMITH]:    Absolutely.

[STATE]:    So fire the first shot on me.

[SMITH]:    (Indicating.)

[STATE]:    Okay.  One right there?

[SMITH]:    Absolutely.

[STATE]:    Okay. Fire a second shot.

[SMITH]:    Okay. And I'm — I'm pushing (indicating).

[STATE]:    You're pushing?

[SMITH]:    Now you push back.

[STATE]:    Okay.  I'm pushing back.

[SMITH]:    All right.  As you push back, I'm up against the car like this (indicating).

[STATE]:    Okay.

[SMITH]:    Next shot came like this.

[STATE]:    Okay.

[SMITH]:    As the doctor say, he was paralyzed from the waist down.

[STATE]:    Okay.

[SMITH]: That's when he fell, the gun, everything, hat.

[STATE]: Go back.

[SMITH]: Ear piece, all fell out.

(Mar. 10, 2022, tr. 609-612.) Smith further explained why there were different ranges of fire for the shots:

[STATE]: All right. So you heard the doctor and the scientist testify as to close fire, right?

[SMITH]: Yeah, there was close fire.

[STATE]: But you said the first shot was right here?

[SMITH]: First shot, exactly how — you know, this arm reaching, just like I said, and the first shot was exactly what I said.

[STATE]: And then you heard there was a different range of fire for each shot.

[SMITH]: A different range of fire for each shot. That's 'cause we was tussling, and I was trying to hold him from using his gun that he said he was going to kill me with, and I was trying to hold him from using his gun that he said what he was going to kill me with. So, yes, we was tussling. All shots not going to be the same — in the same angle if you were tussling with somebody. All the shots, they going to be different range because it's a tussle. That's what a tussle consist of, different shots in the range. Now, if they was straight shots all into it, then I — now I got a situation.

(Mar. 10, 2022, tr. 612-613.) Smith also offered testimony about the shot to Pulley's back and the lack of Smith's DNA on Pulley's hands despite the alleged tussle:

[STATE]: So does Mr. Pulley look at the [unidentified individual who approached Pulley's vehicle] at that point you put the gun right in the guy's back, Mr. Pulley's back?

[SMITH]: Huh?

[STATE]: While Mr. Pulley is looking at the [unidentified individual], distracting him, is that when you put the gun in Mr. Pulley's back?

[SMITH]: No.

[STATE]: Because the science is telling me this gun was on his back.

[SMITH]: Right. And if I can explain to the jury, again, if somebody rushing up against you and they arm — and they got you up against the car, it's not a straight back shot. It's a diagonal shot that went down to let you know that he was into the back like this to where the shot went down in his back that hit his spine. It wasn't a straight direct shot.

[STATE]: It was like this, all six-one, 300 pounds of Mr. Pulley as you're up over him, popping one in his back?

[SMITH]: Sir — sir, I can only tell you what happened. Anything other than this — I'm sitting here. I'm — I'm — I'm — I'm dead wrong. You know? This is not — it's not — it's not no game. It's not no joke. I'm not playing. I'm only telling you exactly what happened. This is what happened.

[STATE]: All right. So you also — you're saying you guys were hemming up on each other.

[SMITH]: Absolutely.

[STATE]: You heard the DNA evidence, right?

[SMITH]: The DNA evidence, I heard it.

[STATE]: Why wasn't your DNA on his palms, his skin, his fingernails?

[SMITH]: What's — I didn't say that he scratched me. I didn't say that. You — you — you're trying to say different things to what I'm saying, sir. I said I holded his hand from him

> raising his gun. I didn't say that he scratched me. I didn't say nothing to that nature, man. This is a serious requirement here, sir. None of that happened. I holded his hand so that he wasn't raising his gun and so he won't kill me.

(Mar. 10, 2022, tr. 615-616.)

{¶ 31} Smith said he picked up his cell phone after the shooting and ran with the Davis .380 caliber gun in his right hand. He drove off without waiting for police because he was scared and crashed his car into a tree. "Good Samaritans" asked if Smith was okay following his motor vehicle accident, helped him out his car, and took him to a friend's house. Smith testified that he did not wait for police at the scene of the crash because he was scared.

{¶ 32} After the conclusion of Smith's testimony, the defense rested. Smith renewed his Crim.R. 29 motion for acquittal on Counts 1 through 3, which the trial court denied. The next day, the jury returned a not guilty verdict on Count 1, aggravated murder, and guilty verdicts on Counts 2 and 3, murder and felonious assault, and the accompanying firearm specifications. The court returned a guilty verdict on Count 4, HWWUD.

{¶ 33} The trial court sentenced Smith in May 2022. Count 3 was merged with Count 2 and the state elected to proceed on Count 2. Smith was sentenced to 3 years on the firearm specifications to be served prior to and consecutive with 15 years to life imprisonment on the base charge. The trial court sentenced Smith to 36 months on Count 4. The court ordered that the counts be served consecutively.

The court stated that Smith was sentenced to "life imprisonment with parole eligibility after serving 21 full years of imprisonment."

{¶ 34} Smith now appeals, raising the following assignments of error for review:

> **Assignment of Error I:** The lower court erred and denied [Smith] due process of law and a fair trial when it failed to properly charge the jury and provide a separate verdict form on the issue of self-defense.
>
> **Assignment of Error II:** The apparent verdict finding that the State proved beyond a reasonable doubt that [Smith] did not act in self-defense and was guilty of murder was against the manifest weight of the evidence.
>
> **Assignment of Error III:** Any verdict finding the State sustained its burden to disprove the essential elements of a properly raised self-defense was based upon insufficient evidence and violative of due process law.
>
> **Assignment of Error IV:** [Smith] was deprived of his right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.

## II. Law and Analysis

### A. Jury Instructions and Verdict Forms

{¶ 35} In the instant appeal, Smith admits the trial court's charge on self-defense was a correct statement of law. He argues, however, that "the Court failed to [e]nsure that as the jury considered each of the homicide charges that they understood that *before* they could enter a finding of 'guilty' it was absolutely necessary for them to first also determine whether the state met its burden to disprove Mr. Smith's claim of self-defense and that they had to be unanimous on that issue." (Emphasis sic.) Smith further contends "it is not clear [the jury] must

have found unanimously that the state disproved at least one element of self-defense, just as they would for any of the offenses charged." Smith believes "the way in which the jury was charged in this case led to dilution and marginalization of the defense of self-defense to such a degree that he was deprived of a fair trial." Smith asserts, "[T]he self-defense elements should have been included either before the consideration of the elements of the offense or at very least at the end of the elements of the offense so that it was properly considered by the jury before they determine guilt of the offense charged, not, as here, much later."

{¶ 36} The state argues the trial court fully and correctly instructed the jury on self-defense. The state cites to *State v. Ellis*, 8th Dist. Cuyahoga No. 109408, 2021-Ohio-1297, to support its arguments that: (1) trial courts have broad discretion to fashion of jury instructions as they see fit and (2) the order in which jury instructions are given does not rise to plain error when the jury is instructed to consider the instructions as a whole.

{¶ 37} The record indicates that the trial court, Smith, and the state exchanged, reviewed, and discussed the jury instructions and verdict forms. Smith concedes that trial counsel did not object to the instructions; thus, this court must review for plain error. As Smith acknowledges, "When the defendant forfeits the right to assert an error on appeal by failing to bring it to the trial court's attention in the first instance, an appellate court applies plain-error review." *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 17, citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 21-22; Crim.R. 52. "Under this

review, the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *Id.* quoting *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16.

{¶ 38} In considering whether jury instructions are incorrect due to plain error, "an appellate court must review the [jury] instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions." *State v. Nicholson*, 8th Dist. Cuyahoga No. 110595, 2022-Ohio-2037, ¶ 137, citing *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45. An improper or erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial would clearly have been different. *Nicholson* at ¶ 137, citing *State v. Davis*, 8th Dist. Cuyahoga No. 109890, 2021-Ohio-2311, citing *State v. Cooperrider*, 4 Ohio St.3d 226, 448 N.E.2d 452 (1983). Therefore, Smith must demonstrate that his convictions clearly would have been different had the trial court instructed the jury on self-defense either before or after the elements of each offense and on the requirement of unanimity.

{¶ 39} Smith claims the trial court "should have charged the jury on self-defense prior to the charges in the indictment, or, at very least, employed the language used in *Coffman* to make sure the jury considered self-defense before they were permitted to make a determination of guilt on the offense charged." Smith cites an instruction from *State v. Coffman*, 6th Dist. Ottawa No. OT-21-011, 2022-

Ohio-2431, in support of his argument: "If you find that the State proved beyond a reasonable doubt all of the essential elements of the crime of assault, *and that the State proved beyond a reasonable doubt that the Defendant did not act in self-defense, you must find the Defendant guilty according to your findings.*" (Emphasis sic.)

{¶ 40} We agree with the state's argument and reiterate the precedent set forth in *Ellis*: "A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *Id.* at ¶ 18, quoting *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. In *Ellis*, this court held that jury instructions with correct statements of law given in a logical manner cannot be said to be confusing or misleading and do not rise to the level or plain error. *Id.* at ¶ 20 ("In considering the order of the instructions, such order could benefit a defendant, because a jury could acquit on the charge considered without consideration of self-defense."). This is especially true when the trial court advises the jury that "the instructions are to be taken or read as whole." *Id.*

{¶ 41} The trial court, in the instant case, provided the following instruction:

> These instructions of law are to be taken or read as a whole. You cannot ignore one part and favor another. It is your sworn duty to accept these instructions and apply the law as it is given to you. You are required to do this apart from any notion or opinion of any kind which you may have as to what the law is or what the law ought to be.

(Mar. 10, 2022, tr. 653-654.) The trial court went on to instruct the jury regarding the elements of each offense charged. This was immediately followed by the trial court's instruction regarding self-defense, a statement of law that Smith concedes was correct. The trial court concluded its self-defense instruction as follows:

> If you find that the State proved beyond a reasonable doubt all the essential elements of all three offenses *and that the State proved beyond a reasonable doubt that the defendant did not act in self-defense, you must find the defendant guilty.*
>
> If you find that the State proved beyond a — failed to prove beyond a reasonable doubt any of the — any of the elements of all the offenses, *or if you find that the State failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, you must find the defendant not guilty.*

(Emphasis added.) (Mar. 10, 2022, tr. 679.) The trial court then provided an instruction regarding the requirement of a unanimous verdict: "Because this is a criminal case, the law requires that all 12 of you be in agreement before you consider that you have reached a verdict." (Mar. 10, 2022, tr. 681.)

{¶ 42} Thus, the jury charge included instructions, which Smith concedes were correct statements of law, for all of the following issues: self-defense, a finding regarding self-defense prior to the finding of guilt, and unanimity. The instructions were given in a logical manner and the trial court advised the jury that they must be "taken or read as whole." Moreover, the trial court did, in fact, employ the language from *Coffman* as emphasized in in the preceding paragraph.

{¶ 43} This court further notes that *Coffman* involved one count of assault, and, therefore, cannot stand for the proposition that a self-defense instruction must

be imbedded after the elements of each offense in the instance multiple charges. The argument that a self-defense instruction must be included after the elements of each offense is also unsupported by *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, the recent Ohio Supreme Court decision discussing the implications of the amendment to R.C. 2901.05, Ohio's self-defense statute.

{¶ 44} The *Messenger* Court found that the amendment did not transform the absence of self-defense into an essential element of a criminal offense: "Self-defense remains an affirmative defense in Ohio, and an affirmative defense is not an element of a crime[.]" *Id.* at ¶ 24, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35. Based on the foregoing, we cannot say the instructions prejudiced Smith or rose to the level of plain error. Therefore, Smith's argument is not well-taken.

{¶ 45} Smith also claims "the Court below compounded error and/or created separate error when it failed to provide a verdict form regarding whether they *unanimously* found that the state had met its burden disproving the claim of self-defense." (Emphasis sic.) Smith argues the alleged error "[left] it open to question whether [the jury] unanimously rejected self-defense [and] undermined the entire verdict[ ] in this case." Smith concedes that trial counsel did not object to the verdict forms and this court must review for plain error. Smith provides no legal authority that a jury must reject an affirmative defense of self-defense on a verdict form.

{¶ 46} The state argues that when a jury reaches verdict after considering self-defense, its finding regarding the affirmative defense is inherent in that verdict.

The state asserts that this court, as well as others, have found no plain error when a separate verdict form for self-defense was not provided. We agree.

{¶ 47} As cited by the state, in *Ellis*, 8th Dist. Cuyahoga No. 109408, 2021-Ohio-1297, we held, "There is no requirement for a separate finding in trials with claims of self-defense." *Id.* at ¶ 23. Moreover, in *State v. Jones,* 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, this court found no error, much less plain error, where the trial court did not provide the jury with a separate verdict form regarding the affirmative defense of self-defense. The *Jones* Court stated, "Even without a separate verdict form on the issue of self-defense, the jury was well aware that it was free to consider [the defendant's] claim of self-defense and to find him not guilty of the offenses to which the defense applied on that basis, if they believed him." *Id.* at ¶ 93 (noting the jury instructions regarding self-defense were specific and detailed and defense counsel repeatedly argued in opening and closing arguments that Jones acted in self-defense).

{¶ 48} Here, the trial court included jury instructions on self-defense, which Smith concedes were correct statements of law. We must presume that the jury followed those instructions. *Id.* at ¶ 92, citing *State v. Willis*, 8th Dist. Cuyahoga No. 107070, 2019-Ohio-537, ¶ 19. Defense counsel argued throughout trial that Smith acted in self-defense. Most notably, Smith testified on his own behalf, claimed he acted in self-defense, and re-enacted the "tussle" he had with Pulley. Therefore, we find, as we did in *Jones*, that the jury knew it was free to consider Smith's self-defense claim and find him not guilty if they believed the defense was credible.

Accordingly, we find no error in the absence of a separate verdict form for self-defense.

{¶ 49} Because the trial court properly charged the jury and provided the requisite verdict forms, Smith's first assignment is overruled.

**B. Manifest Weight Review of Smith's Murder Conviction**

{¶ 50} In his second assignment of error, Smith alleges his murder conviction was against the manifest weight of the evidence because the state failed to meet its burden disproving Smith's self-defense claim. Essentially, Smith asserts that his testimony demonstrates he acted in self-defense and the state did not convincingly prove otherwise.

{¶ 51} The state argues that "substantial credible evidence [was introduced] to suggest that [Smith] lured Pulley to the gas station, calmly walked to Pulley's vehicle, shot him to death, and then desperately tried to flee any consequence of his actions." The state further claims, "[Smith] supports his assertion [that the verdict was against the manifest weight of the evidence] with nothing more than the fact that Pulley was lawfully carrying a weapon, and his own self-serving testimony."

{¶ 52} A self-defense claim includes the following elements:

(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*Messenger,* Slip Opinion No. 2022-Ohio-4562 at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). The state has the burden of disproving Smith's self-defense claim beyond a reasonable doubt. *Id.* at ¶ 27. This is accomplished by negating any one of the three elements of a self-defense claim. *State v. Barker*, 8th Dist. Cuyahoga No. 111597, 2023-Ohio-453, citing *State v. Claytor*, 8th Dist. Cuyahoga No. 110837, 2022-Ohio-1938, ¶ 81, citing *State v. Travis*, 8th Dist. Cuyahoga No. 110514, 2022-Ohio-1233. The state's burden of persuasion is subject to a manifest-weight review on appeal. *Messenger* at ¶ 27.

{¶ 53} When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Martin* at 175.

{¶ 54} As this court has previously stated:

The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question:

whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87. This court held, "[a] conviction is not against the manifest weight of the evidence simply because the jury believed the testimony of the state's witnesses and disbelieved the defendant. The fact that [the defendant] testified concerning his affirmative defense of self-defense does not mean that the jury had to believe him." *State v. Jones,* 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 85.

{¶ 55} In its role as the "thirteenth juror," an appellate court must review the entire record, weigh the direct and circumstantial evidence and all reasonable inferences drawn therefrom, and consider the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *Martin*. "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.'" *State v. Wachee*, 8th Dist. Cuyahoga No. 110117, 2021-Ohio-2683, ¶ 36, quoting *State v. Cassano*, 8th

Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Conversely, "circumstantial evidence requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Id.*, quoting *id.* "'Circumstantial evidence is proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'" *Id.*, quoting *State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37. "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259, 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶ 56} Here, Smith testified he called Pulley to buy marijuana. Pulley took too long so Smith went to the HP gas station to see if Pulley was there. After Pulley arrived, Smith waved to Pulley and walked towards Pulley's vehicle with a water bottle in one hand and a cell phone in the other. Pulley threatened to kill Smith, pulled out a gun, cocked it, and pointed it at him. Smith claimed Pulley pushed him up against his vehicle with his left arm on Smith's neck. Smith admits he shot Pulley with the Davis .380 caliber semiautomatic handgun, which was illegal for him to carry. Smith returned to his vehicle with gun in hand, fled the scene of the shooting, crashed his vehicle into a tree, and fled the scene of the crash. Smith testified he fled both the scene of the shooting and the scene of the crash because he was scared. Smith claimed the locations of Pulley's gunshot wounds and the range at which the shots were fired were explained by the two of them tussling. The jury observed Smith's reenactments of the alleged tussle. They also observed Smith's height, weight, build, and demeanor. Smith did not call any witnesses to corroborate his

testimony, rather Smith relied on circumstantial evidence: he claimed the location of the loaded and ready Smith & Wesson .40 caliber gun following the shooting suggested Pulley was holding the gun when Smith shot Pulley. Smith did not claim Pulley fired the weapon.

{¶ 57} The state presented surveillance video of Smith arriving at the HP gas station 13 minutes prior to Pulley. The cameras captured Smith exiting his vehicle and walking towards Pulley, four muzzle flashes, Pulley falling to the ground, and Smith returning to his vehicle with a "right angled object" in his hand. Smith did not dispute the state's evidence establishing he shot Pulley with the Davis .380 caliber handgun.

{¶ 58} In addition, the state presented the following evidence weighing against Smith's claim of self-defense: Pulley sustained four gunshot wounds, one of which was a contact wound to Pulley's back between his shoulder blades that caused immediate paralysis. Pulley was six feet, one inch tall and weighed 300 pounds, making it unlikely Smith would be able to reach around Pulley to shoot him in the back in such a manner. Smith claims the shot to Pulley's back happened last, but, even if Smith testimony is believed, another gunshot to Pulley's left arm (the same arm that Smith claimed Pulley used to hold him up against the truck) broke Pulley's upper arm bones, humerus, and front portion of his shoulder blade. Despite Smith's claims that a tussle occurred, his DNA was not found on Pulley's hands, palms, or knuckles or underneath Pulley's fingernails. Nor was Smith's DNA found on the Smith & Wesson .40 caliber handgun located near Pulley's body. Lastly, Smith

admittedly fled the scene of not only the shooting, but the subsequent motor vehicle accident. An instruction was given to the jury that while fleeing the scene does not raise a presumption of guilt, it may tend to indicate the Smith's consciousness of guilt.

{¶ 59} In our role as the "thirteenth juror," we cannot say the jury lost its way when it negated Smith's self-defense claim and found any one of the following to be true: (1) Smith was at fault in creating the situation giving rise to the affray, or (2) Smith did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, or (3) Smith violated his duty to retreat or avoid danger. Based on the record before us, the jury's determination that the state's evidence was more credible than Smith's was not against the manifest weight of the evidence and did not result in a miscarriage of justice. This is not the exceptional case in which the evidence weighs heavily against Smith's convictions for murder and felonious assault. Therefore, Smith's second assignment of error is overruled.

## C. Smith's Self-Defense Claim

{¶ 60} In his third assignment of error, Smith argues the jury's finding that he did not act in self-defense was based on insufficient evidence. Smith does not argue the state failed to produce evidence on all the essential elements of murder or felonious assault; he asserts that the state failed to disprove his claim that he shot and killed Pulley in self-defense.

{¶ 61} "A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. Parker*, 8th Dist. Cuyahoga No. 110716, 2022-Ohio-1237, ¶ 7, citing *Thompkins,* 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). The relevant inquiry in a sufficiency challenge is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime existed beyond a reasonable doubt. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), at paragraph two of the syllabus. When making a sufficiency determination, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supports the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 386.

{¶ 62} In *Messenger*, Slip Opinion No. 2022-Ohio-4562, the Supreme Court of Ohio recently addressed the issue of whether self-defense claims are subject to review under a sufficiency of evidence standard on direct appeal. In holding they are not, the *Messenger* Court explained:

> The state has the burden of production regarding the elements of a criminal offense because an accused person has the right to a presumption of innocence on each element. R.C. 2901.05(A); *Morissette v. United States*, 342 U.S. 246, 275, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *Jackson* [*v. Virginia*], 443 U.S. [307,] 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 [(1970)]. The presumption of innocence "is an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created." *Coffin* [*v. United States*, 156 U.S. 432,] 459[, 15 S.Ct. 394, 39 L.Ed. 481 (1895)].

Conversely, there is no due-process right to a presumption of an affirmative defense such as self-defense. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 37; *see also Leland v. Oregon*, 343 U.S. 790, 798-799, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (legislative allocation of the burden of proving the affirmative defense of insanity does not raise a constitutional issue, because the affirmative defense is not constitutionally based). There is also no statutory right to a presumption of self-defense in Ohio. R.C. 2901.05(A) provides that an accused is "presumed innocent," in line with the constitutionally guaranteed right. But R.C. 2901.05(B) states that "[a] person is *allowed* to act in self-defense." (Emphasis added.) With no "proof created by the law in favor of" self-defense, *see Coffin* at 459, the defendant has the burden of producing legally sufficient evidence of self-defense to trigger the state's duty to overcome that evidence.

*Id*. at ¶ 18-19.

{¶ 63} The Court found, "The plain language of R.C. 2901.05(A) reflects that self-defense is still an affirmative defense and that the burden of production is still on the defendant * * *." *Id*. at ¶ 21-22 ("The amendment changed the procedure for adjudicating criminal cases involving evidence of self-defense; it did not make substantive changes to the elements of any offenses."). The Court concluded that while a defendant has the burden of producing legally sufficient evidence that their use of force was in self-defense, the state's burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal. *Id*. at ¶ 24-27.

{¶ 64} While *Messenger* was pending, Smith filed the instant appeal and argued the state's burden to disprove Smith's properly raised self-defense claim is subject to review under a sufficiency of evidence standard. The *Messenger* Court has since decided to the contrary: the state's rebuttal to Smith's self-defense claim

is reviewed under the manifest-weight standard. For the reasons set forth above, the manifest weight of the evidence supports Smith's conviction. Therefore, we cannot say the jury clearly lost its way in concluding the state proved beyond a reasonable doubt that Smith did not act in self-defense when he shot and killed Pulley.

{¶ 65} Smith's third assignment of error is overruled.

### D. Ineffective Assistance of Counsel

{¶ 66} Lastly, in his fourth assignment of error, Smith argues his conviction must be reversed because his trial counsel failed to object to jury instructions and request a separate verdict form regarding self-defense. Smith claims that there was no strategic reason for trial counsel's alleged failures, the effect of which "undermined and marginalized" his entire and only defense.

{¶ 67} "A licensed attorney is presumed to be competent, and a defendant claiming ineffective assistance bears the burden of proof." *Ohio v. Redmond*, 8th Dist. Cuyahoga No. 111138, 2022-Ohio-3734, citing *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). "'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.), quoting *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69. "Trial counsel's strategic choices must be accorded deference and cannot be examined through the distorting effect of hindsight." *State v. Conway*, 109 Ohio

St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 115, citing *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992). "'Debatable trial tactics do not constitute [ineffective] assistance.'" *State v. Williams*, 8th Dist. Cuyahoga No. 97730, 2012-Ohio-4277, ¶ 18, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). "Speculation about the factfinder's possible reaction to trial counsel's strategy is insufficient to demonstrate prejudice." *Redmond* at ¶ 42, citing *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 142.

{¶ 68} To gain reversal on a claim of ineffective assistance of counsel, a defendant must show that (1) his "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland at* 687. The first prong of *Strickland*'s test requires the defendant to show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. *Strickland*'s second prong requires the defendant to show "a reasonable probability that but for counsel's errors, the proceeding's result would have been different." *State v. Winters*, 8th Dist. Cuyahoga No. 102871, 2016-Ohio-928, ¶ 25, citing *Strickland*. The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Strickland* at 697.

{¶ 69} Here, Smith has not demonstrated that his trial counsel's performance was ineffective or prejudicial. Because we found no error in either the jury instructions or the verdict forms as discussed above, we cannot say Smith's trial

counsel performed deficiently. Smith's counsel was not obligated to object to the jury instructions based on an objective standard of reasonableness because the instructions were presented in a logical manner and were complete and accurate statements of law compiled in logical manner. Moreover, Smith's counsel's alleged failure to object to the verdict forms was also objectively reasonable because a separate form for self-defense was not required. Therefore, Smith's counsel's performance was not deficient and his decision not to object was in the exercise of reasonable professional judgment. Because the first prong of the *Strickland* test has not been proven, we need not consider the second.

{¶ 70} Smith's fourth assignment of error is overruled.

## III. Conclusion

{¶ 71} The trial court properly charged the jury regarding self-defense and unanimity. The jury instructions were full, complete, logically ordered, and admittedly included accurate statements of law. We cannot say the jury instructions prejudiced Smith or rose to the level of plain error. Nor can we say the absence of a separate self-defense verdict form was erroneous; the jury was well-aware Smith was claiming self-defense because of the arguments raised by defense counsel throughout trial, Smith's own testimony, and the inclusion of self-defense in the jury instructions. Moreover, Smith's murder and felonious assault convictions are not against the manifest weight of the evidence and the State was not required to present sufficient evidence to disprove Smith's self-defense claim. Lastly, Smith's trial

counsel was not ineffective.  Trial counsel's failure to object to the jury instructions and verdict forms was not deficient because neither were erroneous.

{¶ 72} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

ANITA LASTER MAYS, A.J., and
EILEEN A. GALLAGHER, J., CONCUR